# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 18, 2005   Decided January 13, 2006

No. 04-5388

JEFFREY BARHAM, ET AL.,
APPELLEES

v.

CHARLES H. RAMSEY, IN HIS INDIVIDUAL CAPACITY AND IN
HIS OFFICIAL CAPACITY AS CHIEF OF POLICE, MPD,
APPELLANT

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Consolidated with
04-5389

Appeals from the United States District Court
for the District of Columbia
(No. 02cv02283)

*Robert E. Deso, Jr.* argued the cause and filed the briefs for appellant Peter Newsham.

*Mark H. Tuohey, III* argued the cause for appellant Charles H. Ramsey. With him on the briefs were *Robert J. Spagnoletti,*

Attorney General, Office of Attorney General for the District of Columbia, *Edward E. Schwab*, Deputy Attorney General, *Mary L. Wilson*, Assistant Attorney General, *John M. Faust* and *Justin M. Shellaway*.

*Mara Verheyden-Hilliard* argued the cause for appellees. With her on the brief was *Carl Messineo*.

Before: HENDERSON and RANDOLPH, *Circuit Judges*, and EDWARDS,[*] *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: Plaintiffs-appellees ("plaintiffs") represent a class of individuals arrested by the District of Columbia's Metropolitan Police Department ("MPD") during the morning of a large-scale "anti-globalization" protest on September 27, 2002. Demonstrators staged protests throughout the city that morning, and a number of police actions ensued. Plaintiffs in this case were detained when police officers, following the order of Assistant Chief Peter Newsham, cordoned off the perimeter of Pershing Park in northwest Washington, D.C. and arrested everyone there. Newsham purported to have witnessed widespread infractions that morning by "demonstrators," including traffic violations and scattered acts of vandalism. After observing activities in Pershing Park for about an hour – during which pedestrian traffic flowed freely in and out of the park – Newsham issued the arrest order. Before the arrests occurred, Newsham spoke with MPD Chief Charles Ramsey, who arrived on the scene in the course of monitoring events throughout the city. Ramsey did not question Newsham's decision. Newsham and Ramsey

---

[*]Senior Circuit Judge Edwards was in regular active service at the time of oral argument.

concede that the mass arrest was executed with no prior warning to the occupants of the park to disperse and no warning to them that arrest was imminent. In the end, 386 people were arrested.

Plaintiffs sued Ramsey and Newsham ("appellants") and several other city and federal officials. Plaintiffs claimed, *inter alia*, that the arrests violated their Fourth Amendment rights to be free from arrest without probable cause. Appellants moved for summary judgment, arguing that their status as police officers conferred qualified immunity from liability and precluded plaintiffs from moving forward with litigation against them. The District Court denied their motion, holding that MPD's arrest of hundreds of individuals assembled in the exercise of First Amendment rights, without first issuing an order to disperse followed by a reasonable opportunity to comply, violated plaintiffs' clearly established constitutional rights, thus stripping appellants of any qualified immunity. *Barham v. Ramsey*, 338 F. Supp. 2d 48, 56-63 (D.D.C. 2004). Appellants now seek an interlocutory appeal of that decision.

With respect to Newsham, we affirm the trial court's ruling that his alleged actions violated the plaintiffs' clearly established constitutional rights. Undisputed evidence reveals that Newsham arrested an undifferentiated mass of people on the basis of crimes committed by a handful of individuals who were never identified. Because nothing in the record suggests that Newsham had particularized probable cause to arrest each of the 386 persons caught in the police sweep, *see Ybarra v. Illinois*, 444 U.S. 85 (1979), his claim to qualified immunity raises no genuine issue as to any material fact, *see* FED. R. CIV. P. 56(c). Newsham has no entitlement to qualified immunity.

Ramsey's situation is somewhat different. The Chief admitted having "tacitly approved" Newsham's arrest order. His entitlement to qualified immunity thus turns on whether he knew that the park had not been cleared of individuals who were not observed breaking the law. Based on the record assembled

for summary judgment, it is not possible for us to answer that question. Because Ramsey's claim for immunity turns on the resolution of factual disputes regarding his participation in the events of September 27, 2002, his appeal is premature. *See Johnson v. Jones*, 515 U.S. 304 (1995).

## I. BACKGROUND

### A. *The Events at Pershing Park*

The events relevant to this appeal took place on September 27, 2002, the start of a weekend of demonstrations in Washington, D.C. protesting the annual meetings of the World Bank and the International Monetary Fund. Similar protests had taken place in major cities around the world in the years preceding the 2002 meetings – most notably, a protest in Seattle that disrupted a meeting of the World Trade Organization in 1999, which in turn spawned a string of "anti-globalization" protests. These earlier protests apparently formed a backdrop against which MPD officials prepared for the September 2002 meetings.

In the weeks leading up to the protests, MPD's Civil Disturbance Unit braced for an influx of protestors. Ramsey commanded the department throughout the pre-protest planning and allegedly told members of his staff that officers should overlook minor violations of the law in order to accommodate demonstrators. Newsham was assigned responsibility for a particular zone of the city, which included Pershing Park. Members of the Civil Disturbance Unit apparently were aware of publicly available information that some demonstrators intended to "shut down the city" using obstructive tactics employed in earlier protests. Appellants place special emphasis on MPD's concern that demonstrators would form "sleeping dragons," *i.e.*, groups of protestors knotted together in city streets to clog traffic arteries.

On the morning of the arrests, Newsham traveled through his zone of the city, monitoring reports on his radio and observing the unfolding protest action. According to Newsham, he learned that protestors "had taken to the streets and were disregarding verbal and hand instructions from MPD officers to get up on the sidewalks." Newsham Statement of Material Facts ¶ 39, Joint Appendix ("J.A.") 105. He also claims that "some of the demonstrators in his zone who were unlawfully marching through the streets were also knocking over trash containers and newspaper vending machines, and that at least one store window had been smashed by the demonstrators." *Id.* ¶ 40, J.A. 106.

Upon arriving at Pershing Park, Newsham surveilled the scene for approximately 45 minutes. During this time, he saw a steady stream of individuals entering the park, and he says he saw some protestors "taunting police officers," as well as others "beating on drums and chanting and dancing in an organized manner." *Id.* ¶¶ 46-47, J.A. 107. It is clear, however, that Newsham encountered a dynamic and diverse situation. The "demonstrators" Newsham described never operated as a cohesive unit that entered or left the park intact. Newsham never asserted that the park was empty before "demonstrators" began entering it, nor that everyone who was not a protestor left the park as demonstrators entered. Rather, Newsham stated that "demonstrators" streamed into the park continuously, from "every direction" and over an extended period of time. *Id.* ¶ 45, J.A. 107. Ultimately, everything in the record indicates that a diverse flow of human traffic entered and exited the park as long as its perimeter remained unsealed. And there is nothing in the record to indicate that officers attempted to distinguish between persons who were lawfully in the park and had engaged in no lawless activity before entering and persons who were engaging in unlawful activity in the park or had done so before entering the scene.

Having surveyed these activities, Newsham decided that the protestors "had no intention of concluding their demonstration and dispersing," and that they may have been inclined to transport their demonstration out of the park and into the street. *Id.* ¶ 48, J.A. 107. At some point during his observation of the park, Newsham conferred with U.S. Park Police Major Richard Murphy. Murphy informed Newsham that, although there were no permits issued for assemblies in the park that day, his officers would not initiate arrests. Murphy explained that if he issued an order to arrest without first issuing three successive warnings, he would violate his agency's mass arrest policy. Newsham nonetheless decided to cordon off the park and place its occupants under arrest, and he enlisted the help of the U.S. Park Police to provide backup. By about 10:15 a.m., the park was sealed.

Newsham did not order any persons to clear the park before directing his officers to conduct the mass arrest, and he did not warn the persons in the park that arrest was imminent. He cites two reasons for failing to warn those subject to the arrest: (1) he "believed that probable cause already existed to arrest the demonstrators because of their unlawful actions *prior to converging on Pershing Park*, as well as their unlawful demonstration in Pershing Park," and (2) he worried that allowing the park's occupants to scatter into the streets would cause further disruption. *Id.* ¶ 54, J.A. 109 (emphasis added).

Sometime after Newsham decided to cordon off the park, Chief Ramsey arrived on the scene. Newsham advised the Chief that he believed there was "probable cause to arrest persons who had entered the park at the time they arrived in the park, based upon offenses they had committed before entering Pershing Park, without ordering them to disperse." Ramsey Decl. ¶ 18, Supplemental J.A. 21. Based on this conversation, Ramsey believed that Newsham in fact had probable cause to initiate the arrests, and he therefore did not issue a countermanding order.

Ramsey also says, however, that he did not realize that the park contained people who had not been previously observed engaging in unlawful activity. *Id.* ¶¶ 21, 23, Supplemental J.A. 21-22.

After the park was cordoned off, 386 people were arrested. All were charged with Failure to Obey an Officer, a violation of the traffic regulation that gives police officers authority to direct motorists and pedestrians in order to ensure traffic safety. D.C. MUN. REGS. tit. 18, § 2000.2 (1997). According to plaintiffs, the individuals arrested were "taken into detention and held overnight in punitive conditions, restrained and contorted in stress and duress positions . . . with periods of arrest lasting as many as 30+ hours." Plaintiffs' Br. at 4.

### B. *Proceedings Before the District Court*

In November 2002, several individuals who had been arrested during the September protests filed suit naming federal and city officials as defendants. The complaint challenged the Pershing Park arrests, alleging violations of plaintiffs' rights under the First, Fourth, and Fourteenth Amendments, as well as false arrest, imprisonment, and conversion. In essence, plaintiffs charged that law enforcement officials "trapped" them in Pershing Park and then, by effecting a mass arrest without warning, unconstitutionally detained everyone present. Their suit also alleges constitutional violations connected to the conditions of their confinement, but those claims are not salient to this appeal. The District Court certified a class of individuals who were arrested in Pershing Park. The trial court allowed a separate group of individual plaintiffs to opt out of the class. Those plaintiffs subsequently settled their claims and their case has been dismissed. *See Abbate v. Ramsey*, 355 F. Supp. 2d 377 (D.D.C. 2005).

On September 24, 2004, the District Court issued a memorandum opinion addressing claims by three city officials

– Ramsey, Newsham, and Mayor Anthony Williams – that they enjoy qualified immunity from personal liability. To evaluate those claims, the District Court set out to determine whether the Pershing Park arrests violated plaintiffs' constitutional rights and, if so, whether those rights had been clearly established at the time. Based on an analysis of this circuit's case law, the trial court answered both questions in the affirmative. The District Court held that police officers who intend to capture a large group in a mass arrest must first order members of the group to disperse and then provide a reasonable opportunity to comply. The court held that failure to conform to these standards constitutes a violation of a clearly established constitutional right and deprives an official of qualified immunity.

The District Court next analyzed the actions of each defendant seeking qualified immunity. First, as to Newsham, the court found that charging hundreds of individuals with failure to obey a police order without first ordering them to disperse "is nothing short of ludicrous." *Barham*, 338 F. Supp. 2d at 57-58. Relying principally on *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), the trial court held that arresting every occupant of Pershing Park without prior notice to disperse, and without probable cause to believe that each arrestee had committed a crime, violated clearly established constitutional law. Newsham was thus found to have no qualified immunity from personal liability for his actions. For similar reasons, the trial court denied Ramsey's plea for qualified immunity. Starting from the premises set out in its analysis of Newsham's status, the court held that "a *reasonable* police chief" encountering the events unfolding in Pershing Park "would recognize the need – and indeed *the duty* – to ask a subordinate officer whether a dispersal order had been given prior to ratifying a mass arrest." 338 F. Supp. 2d at 61. With respect to Mayor Williams, however, the trial court found that his actions were too remote from the constitutional violations to expose him to personal liability. *Id.* at 63-65. Ramsey and Newsham now

appeal the District Court's denials of their claims for qualified immunity.

## II. ANALYSIS

### A. *Appellate Jurisdiction and Standard of Review*

We begin by noting our jurisdiction to hear this appeal. 28 U.S.C. § 1291 authorizes appellate courts to hear appeals only from "final decisions" of the district court. The "denial of a claim of qualified immunity falls within the 'small class' of collateral orders subject to immediate appeal under that statute despite the absence of a final judgment." *Moore v. Hartman*, 388 F.3d 871, 875 (D.C. Cir. 2004) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 524-25, 530 (1985)). To take a contrary stance would eviscerate the doctrine of qualified immunity, since it would force certain deserving officials to undergo the burdens of litigation that the doctrine is meant to obviate. Thus, § 1291 confers jurisdiction to review the District Court's rejection of Newsham's motion.

This grant of jurisdiction, however, does not extend to Ramsey's claim to qualified immunity. We are authorized to review a denial of summary judgment invoking official immunity only insofar as doing so requires us to resolve purely legal issues. *See Johnson*, 515 U.S. at 307. As we discuss in greater detail below, because Ramsey's claim cannot be disposed of on purely legal grounds, we lack appellate jurisdiction to resolve the ongoing controversies it raises.

We review the District Court's denial of summary judgment *de novo*. *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1031 (D.C. Cir. 2004). A party is entitled to summary judgment only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

**B.** *Assistant Chief Newsham's Claim to Qualified Immunity*

"Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine recognizes the hardships of subjecting public officials to the rigors of litigation, but it balances that concern against the interest in allowing citizens to vindicate their constitutional rights. *Id.* To ensure the proper maintenance of that balance, the Supreme Court has designed a two-part inquiry to determine whether a government official is protected by qualified immunity. First, there is a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If that question is answered in the affirmative, "the next, sequential step is to ask whether the right was clearly established." *Id.*

In addressing the second question, courts must frame their inquiry at the right "level of generality." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). In other words, it is not enough to say that it is clearly established that police officers may not subject individuals to unreasonable searches and seizures. Rather, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. Prior decisional law need not have supplied a "precise formulation" of the applicable constitutional standard in order to overcome an official's qualified immunity, but the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In this case, it is clear that the "threshold question" for evaluating Newsham's claim to qualified immunity must be answered in the affirmative, because "the facts alleged show the officer's conduct violated a constitutional right," *id.* at 201. The essence of plaintiffs' claim is that a diverse assemblage of people – including many who were engaging in political speech protected by the First Amendment and others who were merely there as observers or passersby – was caught in a mass arrest that was devoid of probable cause. *See* First Am. Comp., *Barham v. Ramsey*, 338 F. Supp. 2d 48 (D.D.C. 2004) (No. CA 02-2283). Probable cause to make an arrest requires a showing that the police had "enough information to 'warrant a man of reasonable caution in the belief' that a crime has been committed and that the person arrested has committed it." *United States v. Short*, 570 F.2d 1051, 1053 (D.C. Cir. 1978) (quoting *Bailey v. United States*, 389 F.2d 305, 309 (D.C. Cir. 1967) (internal quotations omitted)). Plaintiffs allege that the crowd exhibited no behavior that could allow a reasonable officer to believe everyone present had committed a crime. They also contend that the assemblage was targeted for political suppression. These allegations, if true, constitute a violation of the Fourth Amendment.

We have no trouble in concluding that plaintiffs' Fourth Amendment rights were clearly established in the circumstances of the mass arrest. No reasonable officer in Newsham's position could have believed that probable cause existed to order the sudden arrest of every individual in Pershing Park. Even assuming that Newsham had probable cause to believe that *some people* present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining *everyone* who happened to be in the park.

It is firmly established that, to comport with the Fourth Amendment, a warrantless search or seizure must be predicated on particularized probable cause. "Where the standard is

probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." *Ybarra*, 444 U.S. at 91. While the Supreme Court has emphasized that "the probable-cause standard is a practical, non-technical conception," it has made clear that the "substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) (internal quotations and citations omitted). Most significantly, Fourth Amendment case law makes clear that an officer cannot predicate a search or seizure on an individual's "mere propinquity to others independently suspected of criminal activity." *Ybarra*, 444 U.S. at 91.

The mass arrest at Pershing Park violated the clearly established Fourth Amendment rights of plaintiffs by detaining them without particularized probable cause. Everyone arrested in the park was charged with Failure to Obey an Officer. *See* Final Report Relative to Complaints of Alleged Misconduct Made at the October 24, 2002, Hearing of the Committee on the Judiciary of the Council of the District of Columbia Concerning the IMF/World Bank Protests at 8, J.A. 610. The ordinance underlying that offense, a traffic violation, states:

> No person shall fail or refuse to comply with any lawful order or direction of any police officer, police cadet, or civilian crossing guard invested by law with authority to direct, control, or regulate traffic. This section shall apply to pedestrians and to the operators of vehicles.

D.C. MUN. REG. tit. 18, § 2000.2. We share the District Court's conclusion that appellants cannot conceivably impute to Newsham probable cause to believe each person in Pershing

Park at the moment of arrest had violated this ordinance. *See Barham*, 338 F. Supp. 2d at 57-58 ("the 'failure to obey' charge is nothing short of ludicrous"). This conclusion requires no elaboration.

Throughout this litigation, however, appellants have tried to excavate probable cause not from the official reason for arrest, but from the scattered acts of lawlessness that Newsham and others had witnessed that morning. While Newsham is correct that an arrest may pass Fourth Amendment muster even if the only objectively discernible probable cause related to conduct far removed from the offense charged by the arresting officer, *see Devenpeck v. Alford*, 125 S. Ct. 588, 594 (2004), he has failed to show any objective basis for arresting the entire mass of people who happened to inhabit the park. Quite simply, Newsham had no basis for suspecting that all of the occupants of Pershing Park were then breaking the law or that they had broken the law before entering the park. Vague allegations that "demonstrators" committed offenses will not compensate for this shortcoming.

Appellants have attempted to justify the sweep by focusing on allegedly illegal activities observed *near* the scene of the arrest *before* "demonstrators" converged on Pershing Park. Indeed, Newsham evidently justified his decision to Ramsey by citing the unlawfulness that he claims to have witnessed earlier that morning in the surrounding areas. Traffic offenses and scattered acts of vandalism by unidentified individuals in the streets, however, could not have incriminated all of the individuals who happened to occupy the park when Newsham ordered the arrest. Even to the extent that Newsham asserts that some "demonstrators" were unlawfully assembled in the park, he has made no effort to ascribe misdeeds to the specific individuals arrested. Nowhere have appellants suggested that the particular individuals observed committing violations were the same people arrested; instead, they refer generically to what

"demonstrators" were seen doing. This is the upshot of making arrests based on the plaintiffs' occupancy of a randomly selected zone, rather than participation in unlawful behavior. While we have no reason to doubt that unlawful activity might have occurred in the course of the protest – with some individuals engaging in disorderly conduct, for example – the simple, dispositive fact here is that appellants have proffered no facts capable of supporting the proposition that Newsham had reasonable, particularized grounds to believe every one of the 386 people arrested was observed committing a crime.

The fluidity of movement in and around the park preceding the arrests further discredits any attempt to discern probable cause to arrest every person who happened to be there. Newsham concedes that pedestrian traffic flowed freely into the park in the hour before the arrests, and he never presents any reason to doubt that it moved just as freely out of the park. The record sheds no light on how many individuals in the park had previously violated the law. Nor does it reveal probable cause to arrest everyone in the park for participating in an "unlawful assembly." There is no indication of how an officer might distinguish between a "demonstrator" and a person walking to work or enjoying a stroll through the park, let alone how one would distinguish someone engaged in an allegedly illegal assembly from a passerby interested in hearing the political speech of protestors. Ultimately, this case is not about a group of lawbreakers entering an uninhabited park and then remaining united inside. Nothing suggests that unlawful actors who may have entered the park remained there or that law-abiding persons stayed outside. Thus, after letting significant time elapse while a diverse crowd entered and exited the park freely, police arrested everyone who happened to occupy the park at a particular, randomly chosen moment. No authority supports the proposition that such an arrest, wholly lacking in particularized probable cause and almost certainly swallowing lawful bystanders, is constitutionally viable.

Newsham's insistence on referring generically to the individuals who were arrested as "demonstrators" hints at one other possible justification for casting a net across the entire park: that police are permitted to control an undifferentiated mass of people if necessary to quell a large-scale demonstration that has become unruly or violent. The parties' arguments before this court, as well as the District Court's analysis below, focus much attention on the circumstances under which police may deal with a group of demonstrators in the aggregate. Our cases addressing mass arrest situations have countenanced broad sweeps under certain limited conditions. But those cases lend no support to Newsham's claim for qualified immunity.

Our case law addressing large-scale demonstration scenarios does not suspend – or even qualify – the normal operation of the Fourth Amendment's probable cause requirements. Rather, this case law merely amplifies one essential premise that has a bearing on the case at hand: when compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order. Two cases spell this out.

First, in *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977), we addressed the First Amendment implications of the District of Columbia's "police line" regulation and "failure to move-on" ordinance, which had been invoked by police confronting violently disruptive anti-war protests. The court began by noting the absence of evidence suggesting any police bias against the content of the protestors' message. *Id.* at 119-20. Then, in response to a contention that the challenged police practices encroached on the First Amendment because they resulted in the arrest of some innocent people, the court explained that: "It is the tenor of the demonstration as a whole that determines whether the police

may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." *Id.* at 120. The First Amendment does not conflict with the need for flexibility when dealing with large, unruly assemblies: "Confronted with a mob the police cannot be expected to single out individuals; they may deal with the crowd as a unit." *Id.* However, the *Cullinane* decision includes an important caveat:

> We do not suggest of course that one who has violated no law may be arrested for the offenses of those who have been violent or obstructive. As we have seen however the police may validly order violent or obstructive demonstrators to disperse or clear the streets. If any demonstrator or bystander refuses to obey such an order after fair notice and opportunity to comply, his arrest does not violate the Constitution even though he has not previously been violent or obstructive.

*Id*. In this case, police officials faced a fluid situation in Pershing Park. There was a significant time lag between the demonstrators' disruption of traffic and their assembly in the park. People were in the park before the demonstrators arrived and countless individuals flowed freely in and out of the park after the demonstrators arrived. Newsham does not deny that many individuals in the park were law-abiding. Indeed, it is undisputed that, at the time of the mass arrest, Newsham had no basis for suspecting that all of the occupants of Pershing Park were then breaking the law or that they had broken the law before entering the park. In such circumstances, *Cullinane* instructs that police officers may quell an unruly demonstration by "deal[ing] with the crowd as a unit" only after invoking a valid legal mechanism for clearing the area and then providing an opportunity for affected persons to follow an order to disperse. *Id*. The Fourth Amendment demands nothing less in a circumstance such as this. *See Ybarra*, 444 U.S. at 91.

Shortly after the decision in *Cullinane* was issued, the court had another occasion to explain the constitutional limits on mass arrests of demonstrators in *Dellums*. Upholding a jury's verdict that the U.S. Capitol Police Chief was liable for violating the rights of demonstrators arrested on Capitol Hill, *Dellums* held that a group of demonstrators lawfully gathered on the Capitol steps could not be arrested unless the Chief had reason to believe (1) that the demonstrators could be validly evicted under the Capitol Grounds ordinance, (2) that the police gave demonstrators an order to disperse that "apprised the crowd as a whole that it was under an obligation to leave," and (3) that there had been a "reasonable opportunity" to comply. *Dellums*, 566 F.2d at 183. *Dellums* emphasized that "the 'fair notice' required by the *Cullinane* court is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." *Id.* at 181-82 n.31.

Close analysis of *Dellums* and *Cullinane* reveals just how indefensible Newsham's actions were. As a prerequisite to instituting a mass arrest intended to defuse a volatile demonstration, police must have a valid legal basis for clearing the area. Newsham has never invoked any such legal predicate. Even if he had one – for example, if his officers were authorized to form a police line and incrementally close off the park – he could not "deal with the crowd as a unit" unless he first issued an order to disperse and then provided a reasonable period of time to comply with that order. Nothing in our earlier cases ratified Newsham's actions. More important, *Dellums* and *Cullinane* put Newsham, a reasonable police officer, on notice that the Constitution does not tolerate the unwarranted, indiscriminate arrest of hundreds of individuals as a response to the demonstration that he faced.

Institutionally, moreover, MPD clearly grasped the constitutional rights elaborated in the applicable case law. MPD's Manual for Mass Demonstrations and Responding to

Civil Disturbances instructs officers on the protocol for dealing with situations like the one Newsham faced. Under the guidelines established by the department (which are only partially reproduced in the record), officers seeking to disperse a crowd must "attempt to verbally persuade the crowd to disperse of its own accord" by issuing an "initial warning" followed by a "final warning." Then, "if, after a reasonable amount of time following the *final* warning, the crowd continues in its refusal to disperse, the unit commander shall direct that the violators be arrested." MPD Manual for Mass Demonstrations and Responding to Civil Disturbances at 21, J.A. 564.

Significantly, the MPD Manual acknowledges that its procedures embody judicially enunciated constitutional principles. It prefaces the discussion of mass arrest procedures by noting: "Following the civil disturbances of April 1968, procedures were developed by the Metropolitan Police Department, in cooperation with the courts, to provide for the speedy, but fair administration of justice during mass arrest situations." *Id.* at 22, J.A. 565. The procedures now in place apparently resulted from "court ordered prescriptions against certain mass arrest techniques followed during the April 1971[] disorders." *Id.* Standing alone, an internal procedure might not create a predicate for piercing an officer's qualified immunity. *Groh v. Ramirez*, 540 U.S. 551, 564 n.7 (2004). But framed as a response to "court ordered prescriptions," it is further proof that the rights violated by Newsham were clearly established when he acted.

## C.  *Chief Ramsey's Claim to Immunity*

Having found that the mass arrest Newsham ordered violated clearly established constitutional rights, we now examine whether Chief Ramsey's involvement with the arrest deprives him of qualified immunity. Ramsey's participation in the arrests is distinct from Newsham's in a critical respect: he denies knowing that the park had not been cleared of law-

abiding bystanders. If this claim is validated, Ramsey might be entitled to maintain his qualified immunity. The record assembled for summary judgment, however, does not permit a definitive resolution of this factual question. Thus, under the Supreme Court's holding in *Johnson*, 515 U.S. at 307, the District Court's decision denying Ramsey's motion for summary judgment is not appealable.

As noted above, denials of summary judgment on qualified immunity grounds fall within the "small class" of non-final orders suitable for review. But this extension of appellate jurisdiction is not endlessly elastic. The Supreme Court has instructed that when the District Court's decision correctly "resolved a *fact*-related dispute about the pretrial record," namely, that the evidence in the pretrial record revealed a genuine issue of fact for trial, immediate appellate review is not available. *Id.* The Court explained that the justification for reviewing certain denials of summary judgment followed from the importance of appellate court intervention to protect officials from standing trial if a district court erroneously articulated a clearly established principle of constitutional law. *Id.* at 312. That justification evaporates, however, when an immediate appeal would require a reviewing court to delve into the underlying merits of a case. The Court expressed particular wariness about forcing appellate courts to prematurely untangle "factual controversies about, for example, intent – controversies that, before trial, may seem nebulous." *Id.* at 316. Because we find that Ramsey's claim to immunity turns on just such a factual controversy, which we are not situated to resolve one way or another, we conclude that we lack jurisdiction to make the findings necessary to definitively rule on his claim for qualified immunity.

The critical question in adjudicating Ramsey's claim to qualified immunity is whether he knew all of the salient facts that rendered the mass arrest unconstitutional – in particular,

whether he knew that there was no basis for believing Pershing Park contained only individuals for whom there was probable cause to make an arrest. On the record assembled for summary judgment, the dispositive facts are ambiguous. Newsham stated that he informed Ramsey of his plans to arrest everyone in the park, and that he "believed there was probable cause to arrest the demonstrators" based on offenses witnessed by police. Newsham Decl. ¶ 18, J.A. 116. Ramsey submitted two statements about his exchange with Newsham, which bring to the fore the problem in assessing Ramsey's entitlement to qualified immunity. First, after recounting the briefing he received from Newsham, Ramsey claimed that he "believed . . . that probable cause existed to support the arrest of persons in Pershing Park" and that Newsham executed the arrests "correctly believing that . . . Chief Ramsey tacitly approved [Assistant Chief] Newsham's decision." Mayor Anthony A. Williams' & Chief Charles H. Ramsey's Corrected Statement of Material Facts ¶ 38, J.A. 134. He further claimed that he "did not realize, at that point, that the park had not, in fact, been cleared of people before it came to be a holding area for individuals that officers had observed engaged in illegal conduct before those individuals entered the park or that orders to disperse had not been given to the crowd." *Id.* ¶ 39, J.A. 135. In a subsequent statement, Ramsey repeated his assertion that he "did not realize" the park had not been cleared before being populated by lawbreakers, Ramsey Decl. ¶ 23, Supplemental J.A. 22, but he also stated that "Newsham advised that he believed that persons who had not been involved in unlawful activity had been provided an opportunity to leave the park," *id.* ¶ 21, Supplemental J.A. 21.

In order to prevail on his motion for summary judgment, Ramsey needed to show that there was "no genuine issue as to any material fact and that [he was] entitled to a judgment as a matter of law" on the question of whether he facilitated, approved, or condoned Newsham's actions. FED. R. CIV. P.

56(c). That determination hinged on how knowledgeable Ramsey was about the conditions surrounding Newsham's actions. Merely being Newsham's supervisor was not enough to attach liability to Ramsey. *Int'l Action Ctr.*, 365 F.3d at 27. But if he knowingly allowed a subordinate to transgress constitutional limits, then Ramsey courted liability. "A supervisor who merely fails to detect and prevent a subordinate's misconduct . . . cannot be liable for that misconduct. 'The supervisor[] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* at 28 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)) ( second alteration in original).

The record precludes the conclusion that no genuine issue existed as to Ramsey's degree of knowledge about the situation he confronted. First, and most significantly, Ramsey's statement that he "did not realize" the park had not been cleared is not enough to establish an undisputed fact, because both he and others submitted statements that do not square with Ramsey's denial. There appears to be a contradiction between Ramsey's initial claim that he "tacitly approved" Newsham's actions without having discussed whether the park was cleared, and his subsequent statement that Newsham assured him the park had in fact been cleared of innocent persons. And, after reviewing the record before it, the District Court opined that "[a]t worst, Chief Ramsey knew the dispersal order had not been given and thus deliberately flaunted [sic] existing law and MPD policies; at best, he turned a 'blind eye' to the situation and refused to ask the questions necessary to ascertain whether arrests were constitutionally permitted." *Barham*, 338 F. Supp. 2d at 62. Ramsey arrived on the scene to find a large public space, teeming with people and bounded by a perimeter that allowed easy access and egress until it was sealed by police. The plausibility of his claim that he thought all law-abiding bystanders had been evacuated, while hundreds of lawbreakers were corralled into an enclosed area, is not ascertainable from

the record. These factual puzzles are not susceptible to resolution on the record before us. Nor are they for us to decide. They are issues for the fact finder, and the District Court was therefore correct in allowing the claims against Ramsey to proceed.

### III. CONCLUSION

For the foregoing reasons, we affirm the District Court's denial of Newsham's motion for summary judgment, and we conclude that we lack jurisdiction to review its denial of Ramsey's motion.