# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 9, 2006          Decided August 1, 2006

No. 03-7060

ESTATE OF ANTHONY SEAN PHILLIPS, SR.,
LYSA LAMBERT PHILLIPS, PERSONAL REPRESENTATIVE OF THE
ESTATE OF ANTHONY SEAN PHILLIPS, SR., DECEASED,
INDIVIDUALLY AND MOTHER AND NEXT BEST FRIEND OF
ARZEL SHAMAR PHILLIPS AND ANTHONY SEAN PHILLIPS, JR.,
MINORS, *ET AL.*,
APPELLEES

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION, *ET AL.*,
APPELLEES

DONALD EDWARDS,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01113)

---

*Donna M. Murasky*, Assistant Attorney General, for the District of Columbia, argued the cause for the appellant. *Robert J. Spagnoletti*, Attorney General, and *Edward E. Schwab*, Deputy Attorney General, for the District of Columbia, were on brief.

*Ralph L. Lotkin* argued the cause for the appellee. *Joel M. Abramson* was on brief.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Two District of Columbia (D.C. or District) firefighters who were injured and the families of their two colleagues who died in a May 1999 fire (Firefighters) brought a civil rights action against the District and Donald Edwards, the former Chief of the D.C. Fire Department (Department). Edwards seeks interlocutory review of the district court's denial of his motion to dismiss based on qualified immunity. We conclude that the district court erred in denying Edwards qualified immunity because the Firefighters did not allege the violation of a clearly established constitutional right; that is, even if Edwards's failure to remedy the Department's continuing violations of standard operating procedures amounted to conscience-shocking conduct, neither the District nor Edwards owed the Firefighters the "heightened obligation" required by our precedent and by the United States Supreme Court to impose an affirmative duty to protect them under the Due Process Clause of the Fifth Amendment. Accordingly, we reverse the district court's denial of Edwards's motion to dismiss on the qualified immunity ground.

I.

Shortly after midnight on May 30, 1999, D.C. firefighters responded to a multi-alarm townhouse fire at 3146 Cherry Road N.E.[1]  Firefighter Anthony Sean Phillips Jr. entered the first

---

[1]We take the background facts from the allegations of the complaint. *See Wagener v. SBC Pension Benefit Plan*, 407 F.3d 395, 401 (D.C. Cir. 2005) (on review of dismissal, we "accept[] the

3

floor with Lieutenant Frederick Cooper, the officer in charge of his engine company. Soon after entering the townhouse the two were separated and Cooper exited the building without Phillips. Meanwhile Lieutenant Charles Redding and firefighters Joseph Morgan and Louis J. Matthews, all three from a different engine company, also entered the burning building, unaware that Phillips and Cooper were inside. Battalion Chief Damian Wilk, the Incident Commander initially in charge of coordinating the Department's efforts at the site, relied on a portable radio device rather than the stronger-signal mobile radio mounted in his vehicle that he could have used had he established a fixed command post. Wilk radioed Redding twice to locate his position but Redding, inside the house, never received the transmission. Soon another fire truck arrived and began ventilating the townhouse's basement by breaking the rear basement sliding glass door.[2] The truck improperly conducted the ventilation, resulting in a sudden temperature increase inside the structure. Superheated gases from the fire shot up the basement stairway to the first floor. Redding, still on the first floor and in the gases' path, ran out of the house, his face and back burning. He told Battalion Chief Wilk that Matthews was still in the townhouse, unaware that Morgan and Phillips were still inside as well. Wilk did not order a rescue effort until 90

factual allegations made in the complaint as true and giv[e] plaintiffs the benefit of all inferences that can reasonably be drawn from their allegations").

[2]Ventilation is the process by which firefighters remove a fire's byproducts (such as heat, smoke and gas) to make a frontal attack on the fire itself. It usually involves breaking out closed windows in the burning structure, tearing out walls and, when a fire reaches the structure's top floor, cutting holes in its roof. *Webster's Third New International Dictionary* 2541 (8th ed. 1981).

seconds later, when Morgan exited the house suffering from severe burns. Seven minutes after the rescue effort began firefighters found Phillips severely burned and unconscious. Four minutes later they found Matthews in a similar state. Phillips died of his injuries 23 minutes after his removal from the townhouse. Matthews died of his injuries the following day. Morgan and Redding survived but suffered severe injuries.

One year later Morgan, Redding and Phillips's and Matthews's families filed separate civil rights actions under 42 U.S.C. § 1983 (section 1983) against the District, Edwards[3] and three other Department officials, including Wilk and Cooper.[4] The Firefighters argued Edwards was deliberately indifferent to his duty to ensure that the Department complied with its own standard operating procedures (SOPs) and that his deliberately indifferent conduct deprived the Firefighters of their "constitutionally protected liberty, interests in life, personal security [and] bodily integrity" and of "substantive due process of law." Phillips 1st Am. Compl. ¶ 79, Joint Appendix (JA) 65; Redding 1st Am. Compl. ¶ 28, JA 87. The Firefighters relied on, inter alia, the Department's Reconstruction Report on the

[3]Edwards was sued in both his individual capacity as Department chief and in his official capacity, i.e., as the Department. Phillips 1st Am. Compl. ¶ 26, reprinted at Joint Appendix (JA) 47; Redding 1st Am. Compl. ¶ 10, JA 83. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (internal citations omitted)).

[4]The district court consolidated the four Firefighters' cases. Subsequently the plaintiffs voluntarily dismissed their claims against Wilk. *See Estate of Phillips v. District of Columbia*, 355 F. Supp. 2d. 212, 213 n.2 (D.D.C. 2005); *see also infra* note 6.

Cherry Road fire (Cherry Road report) that described numerous SOP violations that, they claimed, caused their respective injuries and deaths, including the Department's failure to follow equipment backup and maintenance procedures, its failure to ventilate the townhouse properly and to coordinate personnel, Cooper's failure to maintain required contact with and to locate Phillips and the Department's failure to supply sufficient personnel to the scene. *See* Phillips 1st Am. Compl. ¶ 44, JA 53. The Firefighters also claimed that another report completed before the Cherry Road fire, namely an internal Reconstruction Report on the 1997 death of firefighter John Carter in a grocery store fire (Carter report), gave the defendants notice of the Department's failure to follow SOPs. The Cherry Road report noted that the deficiencies in training, staffing, equipment and administration identified in the Carter report persisted and declared that "the Department must no longer tolerate the notion that SOPs and proper fireground behaviors are only important for 'major' fires and not as important for 'routine' fires." *Id*. ¶ 44, JA 53 (quoting Cherry Road report). The Firefighters claimed that the Department's "policy and custom not to implement recommendations to improve operation of the [Department] or to enforce [SOPs] was conscious, knowing, and deliberate and not the result of simple or negligent oversight made under emergency, spur of the moment conditions without either the opportunity or time for deliberation" and, as such, was "an affirmative election of a specific course of action." *Id*. ¶ 65, JA 62. Regarding Edwards, the Firefighters alleged that he was required to comply with the "operational mandates of the D.C. Fire Department," and his failure to do so constituted a "de facto policy and custom of the District of Columbia of a deliberate indifference to such matters," *id*. ¶ 64, JA 61–62. Edwards's conduct was "egregious and shock[ed] the conscience" and constituted "deliberate indifference to the [Firefighters'] clearly established rights." *Id*. ¶¶ 67, 68, JA 62.

The District moved to dismiss the Firefighters' complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that it failed to state a claim under section 1983. *See* Def. District of Columbia's Mot. to Dismiss Pl.'s Am. Compl., D.D.C. No. 00-cv-01113, R. Doc. 39. Edwards joined the District's motion and also asserted his qualified immunity from suit in his individual capacity.[5] *See* Notice of Filing, D.D.C. No. 00-cv-01113, R. Doc. 52. The district court denied the motion, *Estate of Phillips v. District of Columbia*, 257 F. Supp. 2d 69 (D.D.C. 2003) (*Phillips I*), concluding the Firefighters stated a substantive due process claim against the defendants. Because the Carter report had put the Department on notice of the "serious consequences that could result" from Edwards's deliberate indifference to the enforcement of the Department SOPs, the court held that their complaint alleged conscience-shocking behavior under *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (conscience-shocking conduct violates substantive due process). *Phillips I*, 257 F. Supp. 2d at 79. It also denied Edwards qualified immunity in light of his "ongoing failure to institute corrective training or to follow [the Department's] own rules even after the scathing reviews contained in a number of safety reports." *Id.* at 80. Based on the Carter report it was fair to assume, the district court stated, that Edwards and the other Department officials "had advance notice of the fatal pattern and practice of SOP violations within the Fire Department." *Id.* The court also concluded that the right to be free from "conscience-shocking executive action" was "clearly established" at the time of the fire because "the potential for deliberate indifference to [rise] to

---

[5]A government official sued in his individual capacity is shielded from personal liability in a 1983 action if, at the time he acted, the constitutional right allegedly violated was not "clearly established." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006).

such a level as to shock the conscience has been repeatedly recognized." *Id.*

After the district court decided *Phillips I*, we issued two qualified immunity decisions, *International Action Center v. United States*, 365 F.3d 20 (D.C. Cir. 2004) (*IAC*), and *Fraternal Order of Police v. Williams*, 375 F.3d 1141 (D.C. Cir. 2004) (*FOP*). The district court *sua sponte* ordered the parties to address the impact of those decisions on the *Phillips I* decision but, after reviewing the parties' pleadings, it declined to modify it. *Estate of Phillips v. District of Columbia*, 355 F. Supp. 2d 212 (D.D.C. 2005) (*Phillips II*). In *IAC* we reversed a district court decision denying qualified immunity to District police supervisory personnel for their alleged failure to properly train and supervise their officers, finding the district court's analysis "failed to link the likelihood of particular constitutional violations to any past transgressions, and failed to link these particular supervisors to those past practices or any familiarity with them." *IAC*, 365 F.3d at 27. In *Phillips II* the district court distinguished *IAC*, however, contrasting the claim there which, according to the court, was "too general to support the plaintiffs' theory of liability," to the Cherry Road and Carter reports which put the defendants "on notice of *specific* circumstances and problems that, if not addressed, were *almost certain* to result in injury or death." *Phillips II*, 355 F. Supp. 2d at 217, 218 (emphases in original).[6] The district court also found *FOP* distinguishable. In *FOP* correctional officers alleged that the District was deliberately indifferent to their safety and therefore violated their substantive due process right when it increased the

---

[6]The Firefighters did, however, voluntarily dismiss Cooper from the litigation in light of *IAC* because he neither knew of nor was responsible for deficient training and enforcement. *Phillips II*, 355 F. Supp. 2d. at 218 n.4.

inmate population at its Central Detention Facility while reducing the number of correctional officers assigned there. We found that the officers did not state a claim under section 1983 because the District's decision to take those actions was a "rational policy choice made amid competing resource demands and in the context of outside pressures," including another facility's closing and cuts in appropriations. *Id.* at 221 (citing *FOP*, 375 F.3d at 1142). Here, the Firefighters alleged that the District and Edwards "did nothing because they simply did not care," *id.* at 222, and if that allegation were true, the district court found, "this deliberate indifference continues to shock this Court's conscience and nothing in the *FOP* decision persuades this Court that its previous conclusion is flawed." *Id.*

The district court read another aspect of the *FOP* decision as "present[ing] a more difficult obstacle" to the Firefighters—our statement that the "lower threshold" for meeting the shock the conscience test by showing deliberately indifferent as opposed to intentional conduct "applies only in 'circumstances where the State has a heightened obligation toward the individual.'" *Id.* at 222, 220 (quoting *FOP*, 375 F.3d at 1145–46). The *FOP* decision gave as an example of the type of claimant owed a "heightened obligation" a prison inmate, as distinguished from a corrections officer, to whom the state owed no heightened obligation under *Washington v. District of Columbia*, 802 F.2d 1478 (D.C. Cir. 1986). *FOP*, 375 F.3d at 1146 (citing *Washington*, 802 F.2d at 1482). Despite the Firefighters' status as voluntary public employees, however, the district court applied the heightened obligation requirement because, under D.C. Code § 5-407(a), they were not free to resign their positions "without the mayor's permission and one-month's notice." *Phillips II*, 355 F. Supp. 2d. at 222. Given this restriction on District firefighters' ability to resign, the district court found "the firefighter's employment comes closer to the heightened obligation standard than would the more common at-

will, voluntary employment situation." *Id.* Edwards filed an interlocutory appeal of the denial of the motion to dismiss on the qualified immunity ground. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (denial of motion for summary judgment on qualified immunity ground immediately appealable); *IAC*, 365 F.3d at 23 ("[W]e have jurisdiction to hear interlocutory appeals from denials of qualified immunity—'to the extent that [the denial] turns on an issue of law.' " (quoting *Mitchell*, 472 U.S. at 530) (alteration in original)).

## II.

Qualified immunity under section 1983 shields a state or local official from personal liability unless his action violated a "clearly established statutory or constitutional right[] of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)); *see also Lewis*, 523 U.S. at 841 n.5 (same).[7] Our review of the district court's legal conclusions is de novo. *Butera v. District of Columbia*, 235 F.3d 637, 647 (D.C. Cir. 2001).

---

[7]*See Lewis*, 523 U.S. at 841 n.5 ("[T]he generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted."); *cf. Kalka v. Hawk*, 215 F.3d 97–99 (D.C. Cir. 2000) (assuming *arguendo* violation of constitutional right to decide qualified immunity issue).

In determining whether a plaintiff states a substantive due process claim, the United States Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–226 (1985)). It is therefore important, the Court went on, "to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake and what the city allegedly did to deprive her . . . of that right." *Id.* To constitute a substantive due process violation, the defendant official's behavior must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8; *Collins*, 503 U.S. at 128 (only most egregious official conduct can be "arbitrary in a constitutional sense"); *Butera*, 235 F.3d at 651 (requirement that state action be sufficiently egregious to shock conscience "exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law"). As we noted in *FOP*, "the conscience-shock inquiry is a 'threshold question' 'in a due process challenge to executive action.' " *FOP*, 375 F.3d at 1145 (quoting *Lewis*, 523 U.S. at 847 n.8). Conscience-shocking conduct that violates due process usually takes the form of affirmative state action. *See, e.g.*, *Rochin v. California*, 342 U.S. 165, 172–73 (1952) (officers entering appellant's home without warrant, tackling him to ground and pumping his stomach against his will shocks conscience); *Norris v. District of Columbia*, 737 F.2d 1148, 1151 (D.C. Cir. 1984) (corrections officers' brutal and habitual beatings of prisoner shocks conscience).

If the plaintiff alleges that the government official *failed* to act, however, he must show that the official was at least deliberately indifferent to his constitutional rights. *See Collins*,

503 U.S. at 117; *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (city must exhibit deliberate indifference toward individual in its custody before he can bring § 1983 claim based on its failure to train officers). Deliberate indifference must still be conscience-shocking in order to state a substantive due process claim; however, as noted earlier, the "lower threshold for meeting the shock the conscience test by showing deliberately indifferent as opposed to intentional conduct applies only in circumstances where the State has a heightened obligation toward the individual." *FOP*, 375 F.3d at 1145–46 (quotation marks omitted).

The Firefighters assert that their complaint is based on affirmative state action and, alternatively, on deliberate indifference, arguing that Edwards's conduct in not following Department SOPs and not providing adequate training constituted the adoption and implementation of a conscience-shocking government custom or policy.[8] *See* Appellee's Br. 8–9

---

[8]Edwards's argument that the Firefighters' action amounts to a claim that the Department failed to provide a safe work environment falls wide of the mark. Appellant's Br. 17. If this were the sole basis of the Firefighters' complaint, Edwards would be correct under our holding in *Washington* and the Supreme Court's holding in *Collins* that there is no constitutional right to a safe workplace. In *Washington*, for example, we held that a corrections officer's allegation that the District's failure to correct unsafe prison conditions that led to his being beaten by an inmate did not state a substantive due process claim because even a "reckless failure" to remedy unsafe working conditions is not a constitutional violation. *Washington*, 802 F.2d at 1481–82. Likewise in *Collins*, the Supreme Court rejected the plaintiff's argument that the municipality violated its employee's substantive due process right when he died, allegedly as the result of the municipality's failure to train and equip its employees working in city sewers. Even though the plaintiff

("From the very beginning, the Firefighters have alleged two independent bases for the Court to find conscience-shocking governmental conduct."). Nevertheless their complaint accuses Edwards of inaction rather than action. *See* Phillips 1st Am. Compl. ¶ 96, JA 71 ("[Edwards] deliberately and knowingly failed to follow . . . established mandatory Standard Operating Procedures . . ."), *id.* ¶ 68, JA 62 ("The custom and policy of Defendant District of Columbia constituted deliberate indifference to the clearly established rights of the Plaintiff Firefighters."); *id.* ¶ 67, *id.* ("The conduct and attitude of the Defendant District of Columbia by virtue of years of notice and opportunity to reduce firefighter risk by ignoring warnings of operational failings, was egregious and shocks the conscience because of, *inter alia,* the special relationship Defendant District

---

"alleged that a prior incident had given the city notice of the risks of entering the sewer lines and that the city had systematically and intentionally failed to provide the equipment and training required by a Texas statute," *Collins*, 503 U.S. at 117–18 (footnote omitted), the Court affirmed the dismissal. Because the claimant had not alleged that the city acted willfully, the Supreme Court read the complaint to allege, inter alia, that "the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety." *Id.* at 126. The Court rejected this notion because "[n]either the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Id.* at 126. The Firefighters, however, charge Edwards with conscience-shocking conduct, not with the failure to provide a safe workplace. *See* Phillips 1st Am. Compl. ¶¶ 67, 68, JA 62 (Edwards's conduct was "egregious and shock[ed] the conscience" and constituted "deliberate indifference to the [Firefighters'] clearly established rights."). *See* Appellee's Br. 6–8.

of Columbia has with its firefighters and their reliance upon the D.C. Fire Department not to institute a policy of deliberate indifference regarding their safety."). Both times the Firefighters' complaint was before it, the district court treated it as alleging deliberate indifference rather than affirmative state action; in *Phillips II*, it applied the *FOP* heightened obligation requirement based on deliberate indifference. *See Phillips II*, 355 F. Supp. 2d at 222; *see also Phillips I*, 257 F. Supp. 2d at 79 (holding "plaintiffs in the present instance have sufficiently alleged that the government violated their substantive due process rights by acting with deliberate indifference"). The Firefighters' arguments before us are similar—that Edwards violated their rights by not acting.[9] *See, e.g.*, Appellee's Br. 3 ("The Firefighters seek to hold Chief Edwards individually responsible for these subject deaths and injuries on the theory that he was deliberately indifferent. . . ."). Fairly read, the Firefighters' complaint alleges that Edwards failed to act and therefore deliberate indifference is the standard we apply.

Because deliberate indifference requires a "lower threshold" showing than does an affirmative act, we insist that only if the "special circumstances" of a special relationship exist can a "State official's deliberate indifference . . . be truly shocking." *FOP*, 375 F.3d at 1146 (internal quotation marks omitted); *see*

---

[9]Despite the Firefighters' claim that *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005), holds that a policy of inaction "is typically an affirmative act," in that case we characterized the District's failure to set standards or train employees as "a policy *of deliberate indifference*." *Smith*, 413 F.3d at 98 (emphasis added). We also considered whether a special relationship existed between the plaintiff and the District, *see id*. at 93, an unnecessary inquiry if *Smith* had in fact been an affirmative act rather than a failure to act case.

*also Butera*, 235 F.3d at 651 ("lower threshold [for meeting the shock the conscience test by showing deliberately indifferent as opposed to intentional conduct] is appropriate in circumstances where the State has a heightened obligation toward the individual") (citing *Lewis*, 523 U.S. at 851).[10] Here the district court found that Edwards owed the Firefighters a heightened obligation because of D.C. Code § 5-407(a), which restricts their ability to terminate their employment. *Phillips II*, 355 F. Supp. 2d at 222 (in requiring firefighter to give one month's notice or obtain Mayor's permission before resigning, section 5-407(a) created a relationship "closer to the heightened obligation standard than would the more common at-will, voluntary employment situation"). On appeal the Firefighters attempt to buttress the district court's finding by pointing to two additional code sections that allegedly restricted their liberty and therefore created a special relationship between them and the District: D.C. Code § 5-410, which forbids firefighters from leaving the District unless on a leave of absence, and D.C. Code § 5-105.08, in effect at the time of the Cherry Road fire but no longer in force, which required firefighters to reside within the District. *See* Appellee's Br. 17. None of these restrictions, individually or collectively, constitutes a deprivation of liberty by the District sufficient to establish a special relationship.[11]

---

[10]It is true that in *Butera* we found that under the "State endangerment" theory discussed there, "something less than physical custody may suffice to present a substantive due process claim." *Butera*, 235 F.3d at 651. This language, however, appeared in the context of an alleged due process violation based on affirmative action rather than deliberate indifference.

[11]Moreover, the restrictions relied on by the district court to distinguish a firefighter's situation from conventional at-will employment are not *imposed*; rather, a firefighter agrees to them as

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court described the special relationship necessary to assert a section 1983 claim based on a failure to act. There social workers personally observed the injuries a father inflicted on his child; the man later beat his son so severely that the child suffered permanent injuries. The child and his mother brought a section 1983 claim

conditions of employment. Other circuits have rejected state-enforced restrictions on an individual's freedom that are voluntarily assumed as imposing a heightened obligation on the state. In *Walton v. Alexander*, 44 F.3d 1297 (5th Cir. 1995), for example, the Fifth Circuit, sitting *en banc*, found no special relationship between the state and the plaintiff, a student at a state-supported residential school, and the school's superintendent could therefore not be found individually liable under section 1983 on a deliberate indifference theory for a classmate's sexual assault of the plaintiff. Even though the plaintiff lost a "substantial measure of his freedom" because of the residential school's restrictions, he attended the school "through his own free will (or that of his parents) without any coercion by the state"; his "willful relinquishment of a small fraction of liberty is simply not comparable to that measure of almost total deprivation experienced by a prisoner or involuntarily committed mental patient." *Id.* at 1304–05. "[O]nly when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a special relationship exist between the individual and the state." *Id.* at 1303 (emphasis in original) (quotation marks omitted); *see also de Jesus Benavides v. Santos*, 883 F.2d 385, 388 (5th Cir. 1989) (no special relationship between plaintiff corrections officers injured by inmates during escape attempt and state because officers "enlisted, on terms they found satisfactory, and . . . were free to quit whenever they pleased") (quoting *Washington*) (cited in *Walton*).

against the Winnebago County Department of Social Services, claiming that its social workers had violated the child's substantive due process right. The Court rejected her claim, concluding that "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97. The *DeShaney* Court nevertheless found that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs," such as in the custodial context if the state restrains a person from acting on his own behalf, a "special relationship" exists which gives rise to an affirmative duty to protect that person. *Id.* at 200–02.[12]

In the public employment context, we have consistently rejected imposing a heightened employer–to–employee obligation because of the absence of a state-imposed restraint on liberty. In *FOP*, we cited *Washington*'s language distinguishing a prison inmate from a corrections officer:

> Prison guards, unlike the prisoners in their charge, are not held in state custody. Their decision to work as guards is voluntary. If they deem the terms of their employment

---

[12]In the failure to act context, at least one circuit has concluded that a special relationship does not exist without custody. *See, e.g.*, *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir.), *cert. denied*, 516 U.S. 994 (1995) (because custody—element the Supreme Court made "the crux of the special relationship rule"—was lacking, plaintiff did not allege the violation of a clearly established constitutional right and officer entitled to qualified immunity).

> unsatisfactory, *e.g.*, if salary, promotion prospects, or safety are inadequate, they may seek employment elsewhere. The state did not force [the plaintiff] to become a guard, and the state has no constitutional obligation to protect him from the hazards inherent in that occupation.

*FOP*, 375 F.3d at 1146 (citing *Washington*, 802 F.2d at 1482). In *Washington*, the plaintiff corrections officer alleged that it was District prison authorities' deliberate indifference to the dangerous conditions allowing his beating to occur—not the prisoners who beat him—that caused the constitutional harm. *See Washington*, 802 F.2d at 1479. In *FOP*, the corrections officers claimed that District officials, "by increasing the number of inmates at the Jail while decreasing the number of correctional officers there, affirmatively subjected correctional officers to an increased likelihood of inmate assaults," thereby violating their due process rights. *FOP*, 375 F.3d at 1142. Because no special relationship existed between the state and the officers in either case, however, action the District did not take could not be the basis of a due process violation. *Id.* at 1146–47; *Washington*, 802 F.2d at 1481–82. *See also Wallace v. Adkins*, 115 F.3d 427, 429–30 (7th Cir. 1997) ("[T]he risk of a job reprimand, or even firing, operates as a practical constraint on a person's actions, [but] this is still a far cry from the custodial settings that normally give rise to a special duty on the state's part"; "prison guards ordered to stay at their posts are not in the kind of custodial setting required to create a special relationship for 14th Amendment substantive due process purposes"); *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir. 1986).

The Firefighters counter that they do not claim constitutional protection from inherent hazards, as did the corrections officers in *FOP*, but from Edwards's deliberate indifference to the known need to institute training and to implement and enforce mandatory safety procedures. This

circumstance, they argue, was not inherent to their profession but rather constituted "avoidable state-created *additional* risks of injury" unknown to the Firefighters when they joined the Department. Appellees' Br. 18 (emphasis added). *Washington*, however, rejected the theory that a failure to act that increases the plaintiff's risk of harm constitutes conscience-shocking action. In *Washington* the plaintiff corrections officer made similar claims, pointing to "overcrowding of prisoners, paucity of guards, inadequate procedures for searching prisoners and their cells for weapons, and inadequate procedures for identifying and isolating prisoners with known violent tendencies." *Washington*, 802 F.2d at 1479. His complaint alleged that the District officials' "reckless failure . . . to remedy unsafe conditions at the reformatory" increased the officer's exposure to the hazard that eventually caused him harm; we nonetheless found the harm—a severe beating—"inherent in [his] occupation." *See id.* at 1479, 1482. As in *Washington*, Edwards's deliberate indifference may have increased the Firefighters' exposure to risk, but the risk itself—injury or death suffered in a fire—is inherent in their profession. As both *Washington* and *FOP* make clear, the District is not constitutionally obliged by the Due Process Clause to protect public employees from inherent job-related risks. *Washington*, 802 F.2d at 1479; *FOP*, 375 F.3d at 1146; *see also Collins*, 503 U.S. at 128 (in absence of allegation of conscience-shocking conduct "we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law. The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship") (internal citations omitted).

The Firefighters point to a recent case of ours, *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005), as a holding counter to our bright-line application of the custody requirement. In *Smith*, an unidentified assailant murdered a seventeen-year-old who was living in the Queenstown Apartments residential complex as part of a program for delinquent youth. We affirmed a jury verdict finding the District liable for the resident's death under section 1983, holding that the District had a heightened obligation to the resident and thereby had an affirmative duty to protect him, a duty which the jury reasonably concluded the District had breached by its conscience-shocking deliberate indifference to his safety. Emphasizing the *Smith* victim's relative freedom of movement yet restricted place of residence (similar to the restraints the D.C. Code provisions allegedly placed on them), the Firefighters claim that *Smith* supports their contention that a heightened obligation can exist absent custody. But in *Smith* we found that the District had a heightened obligation because its *in loco parentis* status significantly restrained the victim's liberty. *See Smith*, 413 F.3d at 95 (resident legally bound to participate in program and live at site it provided; "[h]e could not have gone elsewhere even if, for example, he felt threatened by his roommate or his neighbors"); *id.* at 94 ("Because the District, rather than [his] family, had primary legal control over him, the District had legal responsibility for his daily care."); *id.* (resident "had more freedom than a prisoner—subject to [program] rules, he could come and go, and take [program]-approved weekend home visits. . . . But such flexibility hardy amounts to freedom from state restraints. [He] had to live at Queenstown Apartments. He had no choice."). The restrictions on his liberty—imposed on him by the District—are plainly distinguishable from those restrictions the D.C. Code imposes on the Firefighters' liberty—restrictions voluntarily assumed by

the Firefighters as conditions of employment by the Department.

The facts here, like those in *DeShaney*, are indeed tragic. Joseph Morgan and Charles Redding suffered severe injuries and Anthony Phillips and Louis Matthews died attempting to save the lives and property of others. But the Constitution does not provide a basis for holding Edwards individually responsible.[13] The Firefighters have not alleged the deprivation of a clearly established constitutional right and Edwards is therefore entitled to qualified immunity from suit in his individual capacity. Accordingly, we reverse the district court's denial of Edwards's motion to dismiss based on qualified immunity and remand for further proceedings consistent with this opinion.

*So ordered.*

---

[13]This is not to say that state law tort claims are not available to the Firefighters. Indeed, their consolidated complaints include pendent causes of action for wrongful death and intentional tortious conduct. *See, e.g.*, Phillips 1st Am. Compl. ¶ 87, JA 67–68. In addition, as the District Court pointed out, while the District of Columbia Police and Firefighters Retirement and Disability Act, D.C. Code §§ 4–601-34, generally provides " 'the exclusive remedy against the District of Columbia for uniformed personnel' injured in the performance of their duties," it does not preclude an intentional tort claim brought against a public official. *Phillips I*, 257 F. Supp. 2d at 83–84 (quoting *Vargo v. Barry*, 667 A.2d 98 (D.C. 1995)).