# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 16, 2009      Decided November 20, 2009

No. 08-7083

SARAH CARR, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-00098-ESH)

---

*Stacy Anderson*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellant. With her on the briefs were *Peter J. Nickles*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

*Daniel M. Schember* argued the cause for appellees. With him on the brief were *Susan B. Dunham*, *Arthur B. Spitzer*, and *Fritz Mulhauser*.

Before: SENTELLE, *Chief Judge*, GRIFFITH, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Opinion concurring in part and dissenting in part filed by *Chief Judge* SENTELLE.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* GRIFFITH.

SILBERMAN, *Senior Circuit Judge*: The District of Columbia appeals the district court's grant of summary judgment in favor of a class of plaintiffs. They participated in a protest march through the streets of Washington D.C. and were arrested by District police after the protest became violent. The plaintiffs sued, alleging they were arrested in violation of their First and Fourth Amendment rights. The district court granted them summary judgment on Fourth Amendment grounds, but the only relief provided was an injunction ordering that plaintiffs' arrest records be expunged. We reverse and remand for further proceedings.

I

On the evening of President George W. Bush's second inauguration, January 20, 2005, a group of several hundred people, including four of the five named plaintiffs in this case, gathered at a church at 1459 Columbia Road N.W., in Washington, D.C., for an "Anti-Inaugural Concert." The Metropolitan Police Department was aware of the event through routine Internet monitoring and assigned an undercover officer to attend. He was directed to report any potentially illegal activity or public safety concerns through a chain of command

that ended with Special Operations Division Commander, Cathy Lanier.[1]

While at the concert, the undercover officer saw a flier promoting a march to protest the inauguration of President Bush. The march was to start immediately after the concert. It came as a surprise to the police department: it was not publicized on the Internet and the demonstrators had not obtained a permit for the march, as required by District law. The flier advertised that the march would begin at the church and proceed through the Columbia Heights neighborhood to the Washington Hilton at 1919 Connecticut Avenue N.W., where one of the inaugural balls was taking place. And the flier stated the march was to be an "explosive protest." The undercover officer heard someone announce from the stage that the protestors planned to "crash" the inaugural ball and also heard some protestors talk about damaging property along the route. He also reported that at the conclusion of the concert, organizers distributed bandanas and vinegar. Detective Drew Smith, the officer to whom the undercover officer reported, stated that vinegar is often applied to bandanas in such contexts to create a makeshift "gas mask," which mitigates the effect of pepper spray or tear gas.

As the concert concluded just after 11:00 p.m., approximately 500 people left the church. Smith was waiting outside in an unmarked car. He observed some concert goers leave the area. A large group, however, including four of the five named plaintiffs, congregated at the intersection of Columbia Road and 16th Street N.W. Many in the group lit torches – large poles supporting soup cans with flaming liquid.

---

[1] Of course we take the facts and all reasonable inferences therefrom in the light most favorable to appellant, the nonmoving party. *See e.g.*, *Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1364 n. 1 (D.C. Cir. 1998).

A number of others covered their faces with bandanas. Eventually, about 250 to 300 people began marching westbound on Columbia Road. As they marched, carrying the torches, they pounded on plastic buckets and chanted loudly. Detective Smith and other officers in marked police cars followed behind.

All of this information as well as the undercover officer's belief that protestors would engage in violence was conveyed up the chain of command to Commander Lanier. She decided to monitor the events in person. She arrived at the scene in a department cruiser just as the group crossed the intersection of Columbia Road and 16th Street N.W. Commander Lanier was accompanied by Officer Patrick Keller who served as her "scribe." Their cruiser turned onto Columbia Road and followed the marchers from behind.

As the march progressed, various officers on the scene witnessed acts of vandalism. Smith observed protestors dragging newspaper vending machines into the street to prevent police from following behind them. Others used their bicycles to block traffic at intersections. Commander Lanier saw a number of marchers use their flaming torches to set fire to debris in trash containers along the street and the undercover officer witnessed marchers spray painting buildings and cars.

As the march reached the 1700 block of Columbia Road N.W., it became even more destructive. The demonstrators broke windows or glass doors at several different businesses on that block. The undercover officer reported to Detective Smith that he observed "persons within the march" propel missiles with "wrist rocket slingshots" to break some of the windows. Each time a window was broken, according to Keller, the group cheered and its members raised their arms. It appeared to him as though the entire group was celebrating the destruction of property. Commander Lanier also viewed the celebrations as a

group response, as opposed to the actions of just a few individuals. When the marchers reached the Sun Trust Bank at 1800 Columbia Road N.W., members broke several of the bank's windows. Once again, Keller witnessed the group cheering with members raising their arms in response to the destruction. At about this time, the fifth named plaintiff – Matthew Singer – ran out of the nightclub he was in to join the march. Ominously, someone in the group threw a rock or brick through the window of the police department's Latino Liaison Unit office followed by more loud cheering and waving by what appeared to Officer Keller as everyone in the group.

Commander Lanier, in response to the destruction, ordered two of the department's Civil Disturbance Unit platoons to the area. According to the officers' affidavits, one such platoon arrived from the south and set up a police line across 18th Street north of Belmont Road N.W. in front of the oncoming demonstrators. The other platoon arrived from the north and traveled south on 18th Street, coming behind the demonstrators. This latter platoon included a marked police car driven by Lieutenant Jimmie Riley and several police department vans. As Riley's car arrived directly behind the marchers, one of the protestors hurled a brick into the windshield of the police cruiser, shattering it. After that, numerous other demonstrators threw objects including rocks and bottles at the police car and police vans.

Based on all of the above described events, Commander Lanier ordered that the protestors be arrested. But as officers from Lieutenant Riley's platoon emerged from their vehicles, many of the protestors ran away – south along 18th Street. Stopped by the police line formed across 18th Street, this group of protestors turned into an alley running from 18th Street to Columbia Road. Once in the alley, the marchers' escape was prevented as another police line blocked the other exit from the

alley to Columbia Road. Lieutenant Riley and members of his platoon followed the group into the alley and arrested them there. No order to disperse was given prior to the protestors' arrests. In all, 65-75 people, including all five of the named plaintiffs in this case, were arrested in the alley. Though Commander Lanier believed she had probable cause to arrest the protestors for rioting, she directed that the field arrest forms indicate that the arrest was for parading without a permit. Charging the protestors with the lesser charge of parading without a permit allowed the arrestees to take advantage of expedited release procedures that would not apply to rioting charges.

The named plaintiffs do not dispute that they marched in the protest. Four of the five – Sarah Carr, Allyson Kirk, Chelsea Kirk, and Jonathan Scolnik – attended the concert and marched with the group from the church to the area where property was destroyed. The other named plaintiff, Matthew Singer, was in a bar near 18th Street and Columbia Road N.W. when he saw the protestors march by; he admits that he then ran out to join the group. Nor do plaintiffs dispute that some persons near or among the marchers engaged in acts of property destruction. They do, however, challenge the police officers' characterization of the group's response. While the police affidavits suggest the entire crowd appeared to be encouraging the property destruction, several of the plaintiffs suggest that they were not even aware of any vandalism, let alone that they or the entire group cheered in support of it.

The named plaintiffs also dispute how they came to be arrested in the alley. All of them assert that they marched *past* the 18th Street entrance to the alley, turned right on Belmont Road, and turned right again back onto Columbia Road. Carr, Scolnik, and Singer claim that police then herded them into the alley via the Columbia Road entrance where they were arrested.

Chelsea and Allyson Kirk assert that they entered the alley from Columbia Road voluntarily because it was the shortest way to return to the Metro but that they were arrested by police once they walked in the alley.

The plaintiffs brought a class action suit against the District under 42 U.S.C. § 1983, alleging that all those who were arrested and who "committed no other act providing probable cause" were arrested in violation of their First and Fourth Amendment rights. After discovery, the parties filed cross-motions for partial summary judgment on the issue of liability. The district court denied the District's motion for summary judgment and granted summary judgment in behalf of the plaintiffs.

Plaintiffs' arrests violated the Fourth Amendment, according to the district court, because the police, as a matter of law, simply could not have had probable cause to arrest those in the alley. Even viewing the facts in the light most favorable to the district, the police did not have justification to arrest on any of the proffered bases. That was so because the statement of an officer that the mob acted uniformly in celebrating the destructive acts of individual protestors was only a "generalized statement" insufficient as a matter of law to establish probable cause *vis-a-vis* the class. The court's key holding was that it was fatal to the district's position that the officer lacked "particularized grounds" to believe that *every one* of the seventy persons arrested committed the crime of rioting because the officers could not possibly have observed each one's behavior. *See Carr v. District of Columbia*, 565 F.Supp. 2d 94, 99-101 (D.D.C. 2008).

Turning to the charge of parading without a permit, the district court apparently concluded that since the offense of parading without a permit requires a showing of intent, no

reasonable officer could conclude – without a dispersal order – that the marchers were aware that the march lacked a permit. *Id.* at 102-04. The court observed, moreover, that "the district has offered no indication of how the arresting officers could distinguish between the protestors and any other person who might have been in the alley at the time the arrest was ordered" (which presumably was a reason buttressing the court's conclusion regarding the rioting grounds for arrest as well). *Id.* at 104 n.14.

The district court based its analysis of both proffered grounds for plaintiffs' arrests on our circuit precedent, specifically two opinions – one, *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1973), from the Vietnam War era, and our quite recent *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006).

II

Under the District of Columbia's criminal law, a riot is defined as "a public disturbance *involving* an assemblage of 5 or more persons which by tumultuous and violent conduct *or* the threat thereof creates grave danger of damage or injury to property or persons" (emphasis added). D.C. Code § 22-1322(a). And it is also unlawful for anyone to engage in, incite, or urge others to engage in a riot. *Id.* at § 22-1322(b), (c).

In light of that definition, if members of the crowd were cheering acts of violence committed by other marchers, they would be engaging in criminal conduct. Appellees' counsel did not dispute that proposition; moreover, he shrewdly conceded that the district court was in error in concluding that the police were obliged to identify the individuals who engaged in violence (and presumably only arrest them). And he also conceded that the district court erred in concluding that Officer Keller's

statement that "the mob acted uniformly in celebrating the destructive acts of individual protestors, thereby encouraging more such acts" was only a "legally insufficient generalized statement." Rather, he recognized that under this court's precedent, officers may be able to establish that they had probable cause to arrest an entire group of individuals if the group is observed violating the law even if specific unlawful acts cannot be ascribed to specific individuals. Even so, counsel contended that the evidence in this case was inadequate, as a matter of law, to establish that the officers could observe the whole group.

Appellees also contend that the government did not prove – which they assert is the government's burden – that *all* of the persons arrested in the alley were marchers. According to appellees, the government must show that the alley was cleared before the protestors were herded into the alley and that the police ensured that no non-marchers entered the alley from the back side (Columbia Road). Several of the plaintiffs claimed that they, in fact, entered the alley by that circuitous route, but they also admitted they were marchers – which is paradoxical since even if some marchers entered the alley from the back side and all marchers were legitimately considered rioters, it would not matter how they entered the alley.[2] Only if the police should have known (or did know) that non-marchers entered the alley from Columbia Road could those non-marchers claim a possible illegal arrest.

In any event, appellees' case boils down to the proposition that there was an insufficient showing to establish probable

---

[2] If it were determined that there was probable cause to arrest the named plaintiffs, it is not clear what effect that has on the class action, *see East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977), but in any event, that issue has not been presented.

cause that the 65-75 persons arrested – each and every one – were engaged in the crime of rioting, even as broadly defined. Appellees seem to contend that no arrests could take place unless the officers could observe every single member of the marchers and, perhaps – it is not clear – testify that each one was either participating in vandalism or cheering it on, and furthermore, that at the time of the arrest of the 65-75 in the alley, no non-marchers (non-protestors) were scooped up. The issues before us are thus considerably narrower than that which the district court articulated – and they are really factual, not appropriate for summary judgment.

We do not think *Cullinane* and *Barham* support the district court's reasoning. Neither case involved an arrest for rioting or encouraging a riot. In *Cullinane*, protestors were arrested only for violating a "failure to move on" statute but, as appellees' counsel recognized, we observed in that case that, "[i]f all members of a group are arrested, the prosecutor may well be able to prove by the testimony of policemen who were at the scene, that there was probable cause to believe that *the group as a whole* was violating the law by violence or obstruction . . . ." 566 F.2d at 121.

In *Barham*, protestors were arrested for failure to obey a dispersal order of an officer, but since no order was given, the court considered whether the police had grounds to arrest for unlawful assembly or for previous acts of vandalism. An assistant police chief monitoring groups protesting the annual meeting of the World Bank had witnessed some unidentified demonstrators engage in scattered acts of vandalism throughout the day. Later that day, a large group of demonstrators converged on Pershing Park. After watching the scene for 45 minutes and despite observing "a diverse flow of human traffic enter[ing] and exit[ing] the park," the officer, without giving a dispersal order, directed that everyone in the park – a group

numbering 386 people – be arrested. 434 F.3d at 569-70. We held that police did not have probable cause to arrest everyone in the park on the basis of those earlier acts witnessed by the assistant police chief, because "[t]raffic offenses and scattered acts of vandalism by unidentified individuals in the streets . . . could not have incriminated all of the individuals who happened to occupy the park" at the time of the arrest. *Id.* at 574. Neither was there probable cause to arrest for an unlawful assembly as there was no way for police to differentiate between assembled demonstrators and others that just happened to be in the park at the time. There was no suggestion of a riot in *Barham*; the police only argued that the arrests were justified on the isolated acts of vandalism and unlawful assembly grounds.

Of crucial significance, we made clear that the individuals in *Barham* "never operated as a cohesive unit." *Id.* at 569. Moreover, we carefully noted that "the *crowd* exhibited no behavior that could allow a reasonable officer to believe *everyone present* had committed a crime." *Id.* at 573 (emphasis supplied); *see also id.* at 574 ("[T]his case is not about a *group of lawbreakers* entering an uninhabited park and then *remaining united inside*.") (emphasis supplied). To be sure, as the district court emphasized, we did say that probable cause must be particularized, *see id.* at 573, but it is clear from our opinion – and from our previous opinion in *Cullinane* – that that showing is satisfied if the officers have grounds to believe all arrested persons were a part of the unit observed violating the law.

Turning to the evidence in our case, the key testimony as to the behavior of the marchers as a group, as we noted, was that of Officer Keller, whose affidavit states that as he trailed the marchers, he saw people within the group throwing objects at windows of several storefronts. "Each time a window was broken," he said, "the group cheered and its members raised their arms." The celebration came from "what appeared to be

everyone in the group." Nevertheless, plaintiffs contend that from his vantage point, trailing the marchers, Officer Keller could not have seen the entire crowd and so could not *competently* testify under Fed. R. Civ. P. 56(e)(1) as to whether the entire crowd was encouraging a riot.[3] But that is hardly an issue of "competence" under the Federal Rules; courts exclude affidavit testimony on competence grounds when the affiant is somehow not qualified to testify on the subject. *See e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008) (prison's Pastoral Administrator not competent under Rule 56(e) to testify about the cost of procuring prison meals). Keller, on the other hand, was undeniably present and it is not claimed that his vision was impaired. He is certainly qualified to describe what he saw. *See Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (affiant competent under Rule 56(e) to testify to personal observations and experiences). He may or may not have had the appropriate vantage point but that, of course, is an issue of fact for the jury, not a question of competence.

Insofar as appellees (or the district court) are suggesting that no one could be "competent" to see everyone individually in a large crowd, they are postulating an impossible burden not drawn from our precedent. Police witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law. A requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot, particularly

---

[3] Plaintiffs suggest that a video depicting portions of the march proves that someone from the back of the march could not see the entire crowd. The video, however, does not even show the undisputed acts of property destruction let alone that someone in Officer Keller's position could not have seen the entire crowd's reaction to those acts.

when it is on the move – at night. To satisfy appellees' suggested standard of proof would require virtually as many officers as rioters – and even then it is doubtful that it could be met. Paradoxically, appellees read the statute so as to make it unenforceable in situations where it is most needed. To be sure, under the standard of our cases – that the police are obliged to show that the crowd acted unlawfully as a unit – it is possible that an entirely innocent person would be mistaken for a rioter. But it should be borne in mind that the legal issue is probable cause, not ultimate conviction. Probable cause only requires a reasonable belief of guilt, not a certitude. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause, however, we deal with probabilities. These are not technical, they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.").

Alternatively, appellees argue that even assuming *arguendo* that it reasonably appeared to police that everyone in the street was rioting, the police still did not have probable cause to make the arrests in the alley. They again rely heavily on *Barham*. As we noted above, in *Barham* the assistant police chief ordered the arrest of everyone in the park and argued his decision was justified because he had observed unidentified demonstrators engaging in unlawful acts on the streets *earlier in the day*. 434 F.3d at 574. We easily rejected that argument in part because evidence in the record showed that pedestrian traffic flowed freely into the park before the mass arrest. Therefore, the police could not have had "reasonable, particularized grounds to believe every one of the 386 people arrested" were the same people observed committing crimes. *Id.* Appellees claim the alley is analogous to the *Barham* park.

But in *Barham* the record showed that many people who could not be tied to illegal activity streamed in and out of the

park *before* the mass arrest. The parties agree that there is no affirmative evidence here of individuals not associated with the protest being present in the alley. Appellees acknowledge this point, but maintain that it makes no difference because the District bears the burden of proving probable cause. Granted the district does have the burden of proving officers had probable cause, *see Dellums v. Powell*, 566 F.2d 167, 175-76 (D.C. Cir. 1977), but that burden does not oblige the District to exclude definitively the bare possibility that there were people that played no role in the protest in the alley before the protestors entered. The District must show only that the officers had reasonable grounds to believe, *see Barham* 433 F.3d at 574, that everyone arrested was part of the rioting group.

In that regard, there are material issues of fact that must be resolved. Plaintiffs and police tell two very different stories as to how the plaintiffs came to be arrested in the alley. And, we think the police's recounting of events, which we must credit at this stage, certainly permitted the police to believe reasonably that everyone in the alley had been a marcher.

The police affidavits stress that officers established a line on 18th Street in front of the protestors and south of the alley as Lieutenant Riley's Civil Disturbance Unit moved in from behind. According to Officer Keller, as Riley's unit approached the crowd from behind, "the mob ran southward along 18th Street, N.W., with members running westward into an alley between Belmont Road, N.W., and Riley's Cruiser. MPD officers caught the members of the mob who ran into the alley . . . ." Keller stated that all this took place as uninvolved onlookers stood by undisturbed. Other police affidavits corroborate that account. Importantly, the police accounts uniformly state that police arrested those members of the crowd who ran into the alley, as opposed to indiscriminately arresting everyone they happened to find in the alley as in *Barham*. There

is also evidence that could allow a fact finder to conclude that the police took steps to ensure that individuals not connected to the demonstration would not be caught up in a mass arrest in the alley. For example, the police stated that they blocked off the Columbia Road opening to the alley, which would block the marchers' escape out of the alley but also, presumably, prevented others from entering. The District also points to video evidence which shows police officers clearing the alley of non-demonstrators prior to the protestors' arrival.[4]

Of course, the plaintiffs dispute the officers' account. All of the named plaintiffs claim that they walked past the 18th Street entrance to the alley, turned right on Belmont Road, turned right again onto Columbia Road and then entered the alley from the Columbia Road side. Although these plaintiffs were, in fact, marchers – and, as we pointed out, as marchers it would not matter how they entered the alley – if their testimony were believed, it could cast doubt on the effectiveness of the officers' claimed blockage of the Columbia Road alley entrance. But again, that is an issue for the jury.

\* \* \*

Finally, we disagree with plaintiffs (and the district court) that the police could not lawfully complete the mass arrest without first ordering the crowd to disperse and then giving plaintiffs an opportunity to comply. We recognized in *Cullinane*, 566 F.2d at 120 that when police face an unruly crowd they *may* give a dispersal order and then arrest those who,

---

[4] Plaintiffs argue that the District's brief fails to explain why out of 250-300 marchers, only 65-75 were arrested. We are puzzled as to why this matters. The fact that officers did not arrest everyone in the crowd that appeared to be rioting says nothing about whether the officers had probable cause to arrest those they did.

after reasonable opportunity to comply, fail to do so. We continue to acknowledge that this tactic will be invaluable to police in certain circumstances. A dispersal order might well be necessary in a situation in which a crowd is "substantially infected with violence," *id.*, or otherwise threatening public safety, yet officers cannot reasonably believe that the crowd is acting unlawfully as a unit. In that event, a dispersal order might be the only means of distinguishing the wholly innocent from the others. Indeed, that was the situation presented in *Barham* and that is why we thought that officers could only deal with the crowd as a unit by first giving an order to disperse. *See Barham*, 434 F.3d at 575-76.

As useful as the dispersal order tactic may be in certain situations, neither *Cullinane*, *Dellums*[5], nor *Barham* establish it as a constitutional prerequisite before every group arrest. If police have probable cause to believe that the group they are arresting is committing or has committed a crime, no more is necessary. Requiring a dispersal order in addition to the ordinary probable cause threshold would be particularly anomalous in a case like this in which officers have reason to believe that an entire crowd is engaged in or encouraging a riot. In such a dangerous situation, officers may wish to quell a disruptive situation *and* arrest those responsible for it, but a dispersal order – even if effective, which is doubtful – would

---

[5] As we explained in *Barham*, this court held that a dispersal order was required in *Dellums* before police could arrest "a group of demonstrators lawfully gathered on the Capitol steps," *Barham*, 473 F.3d at 576. Because the *Dellums* demonstrators had permission to assemble, we said that it would be a form of entrapment to arrest them without first giving an opportunity to disperse. *Dellums*, 566 F.2d at 182-83. We did not hold that a dispersal order is required for any group arrest.

allow the putative rioters to escape. A refusal to disperse is, therefore, not one of the elements of a rioting charge.[6]

## III

In addition to ruling that the officers could not have had probable cause to arrest the protestors for rioting, the district court held that they could not have had probable cause to make arrests for parading without a permit. The District contends on appeal that this too was erroneous.[7] On this point we disagree with the District.

We have held that to be criminally liable for parading without a permit, one must do so knowingly. *See Sheehan*, 512 F.3d at 631. Accordingly, officers who make such an arrest

---

[6] Plaintiffs contend that First Amendment principles prohibited their arrest without first being given a chance to disperse. In sum, plaintiffs contend that they were marching peacefully and if peaceful marchers can be arrested without warning because some other protestors resorted to violence, it will chill First Amendment rights. Aple. Br. at 36-40. The premise of this argument is fundamentally flawed, however, because viewing the facts in the light most favorable to the District, as we must here, it appeared to officers as if the entire crowd was rioting or encouraging riotous acts. And "where demonstrations turn violent, they lose their protected quality as expression under the First Amendment." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972).

[7] Appellees point to the District's policy, which is not to make arrests for parading without a permit. However, a police officer can act consistently with the Fourth Amendment by making an arrest that is supported by probable cause, even if prohibited by state law, *see Virginia v. Moore*, 128 S. Ct. 1598, 1607 (2008) (so holding), so the District's policy is also immaterial in our Fourth Amendment analysis.

must have reasonable grounds to believe that the suspect 1) took part in a parade, 2) without a permit, 3) and did so, *knowing* no permit was granted. In this case, there is no dispute that the demonstrators engaged in a parade and did so without a permit. But appellees do dispute vigorously that the police officers could reasonably believe that the protestors *knew* that no permit had been given, since no dispersal order mentioning the lack of permit was given. Just as we explained with regard to the grounds for arrest for rioting, a dispersal order is not a *sine qua non* for arresting for marching without a permit. If the District could have shown that the protestors had the requisite intent through other evidence, that would have sufficed.

Still, even if the lack of a dispersal order did not, in itself, render these arrests unlawful, the District was presented with a formidable challenge in showing that officers could reasonably believe that all of the protestors knew no permit was granted. The police certainly did nothing to otherwise inform the marchers that their demonstration was not permitted by the District. So the police had no direct evidence upon which to conclude that everyone arrested had the requisite intent. Nonetheless, the District argues that under the circumstances it was reasonable for police to *infer* that *all* of the marchers knew that this parade did not have a permit. It is claimed that the protest march was apparently spontaneous; that the march began at 11:30 at night and proceeded through a residential neighborhood; that the parade's participants were carrying torches, setting fires, and placing obstacles in the street; and finally, that the protest culminated in a riot.

We are not persuaded that the time or character of the march is at all probative as to the marchers' presumed knowledge that a permit was lacking. Why would a marcher believe a permit would not be granted to march on 18th Street, even though it is a partly residential area, or that the District

would not authorize a night march? And that a demonstration turns violent is hardly evidence that shows it more likely than not that a permit was not granted. Obviously, an authorized march or demonstration could turn violent as well as one that was not authorized.

That leaves the District with its spontaneity argument – and that might have been sufficient but for the distribution of the flier, which necessarily suggested to the group earlier planning for the march. We, therefore, affirm the district court's rejection of the alternative non-permit ground for arrest and remand on the issue of probable cause to arrest for rioting only.

*So ordered.*

SENTELLE, *Chief Judge*, *concurring in part and dissenting in part*: I fully join the opinion of the court in all respects concerning the crime of rioting, and therefore concur in the disposition reversing the summary judgment as to the arrest on the rioting charges. However, as to the summary judgment on the arrest for parading without a permit in violation of 24 DCMR § 707.7, I disagree with the court's analysis as expressed in the penultimate paragraph of the opinion and therefore dissent from the affirmance of the grant of summary judgment. It is uncontested that the protestors' conduct met the first two elements for such a violation: the protestors were participating in a march and the District of Columbia had not issued a permit for the march. The only element at issue is the *mens rea* requirement of "knowing." The majority asks, "Why would a marcher believe a permit would not be granted to march on 18th Street, even though it is a partly residential area, or that the District would not authorize a night march?" I would state the question differently: "Why would anyone believe that the District *would* grant a permit for a night march through a partly residential area?" It seems to me that the police could have inferred that the protestors knew that no permit had been issued from the time and location of the march.

It may be that the court's reasoning would support a verdict on this count in favor of appellants after trial, but we review the case on summary judgment. The question on summary judgment is whether there is "no genuine issue as to any material fact." It is true that under Rule 56, "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). It is equally true that "[i]f reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Id.* at 250-51. In making the necessary determination "at the summary judgment stage the judge's function is not [her]self to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

As the evidence to me discloses a reasonable inference opposite than that drawn by the majority and the district court, and as I deem us all reasonable, it appears to me that reasonable minds can differ. Weighing the evidence and the inferences is not for us, but for a trier of fact. I would therefore reverse and remand the summary judgment as to this issue, as well as the first.

GRIFFITH, *Circuit Judge*, concurring in part and concurring in the judgment: I would also reverse the district court and join fully Parts I and III of the court's opinion. I write separately because I disagree with the probable cause standard the majority uses in Part II. As Supreme Court precedent affirms, the Fourth Amendment requires an individualized showing of probable cause before arrest. The majority unnecessarily calls into question the heretofore straightforward application of that standard in this circuit.

## I.

The Fourth Amendment provides, in relevant part, "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." U.S. CONST. amend. IV. Explaining the Fourth Amendment's requirement of a particularized showing of probable cause, the Supreme Court in *Ybarra v. Illinois* stated that "a search or seizure of a person must be supported by probable cause particularized with respect to that person." 444 U.S. 85, 91 (1979). Similarly, the Court in *Maryland v. Pringle* emphasized that "the belief of guilt must be particularized with respect to the person to be searched or seized." 540 U.S. 366, 371 (2003). In other words, the police must have a reasonable and particularized belief that each individual arrested committed a crime. As the *Ybarra* Court made clear, "This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another." 444 U.S. at 91. Before today, our case law did not suggest "that one who has violated no law may be arrested for the offenses of those who have been violent or obstructive." *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977). Today's decision suggests just that.

Describing what must precede an arrest when a crowd of political demonstrators has gotten out of hand, the majority creates a standard of probable cause less demanding than *Ybarra* and *Pringle* for circumstances in which the police cannot say anything more than the arrested person was part of a group some of whose members were rioting. "Police witnesses," the majority concludes, "must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." Slip Op. at 12. By this standard, the police are permitted to conclude that all members of the crowd were breaking the law, not because of a particularized showing that each of its members was rioting, but because of an officer's "reasonable belief that the entire crowd is acting as a unit." *Id.*

It is far from clear what the majority means when it speaks of a "crowd . . . acting as a unit." I would have no quarrel with the majority's approach if it meant there must be probable cause that every individual in the crowd acted in concerted lawlessness with the rest of the group. But the majority refuses to ask this of the police. Not only does the majority avoid the language of *Ybarra* and *Pringle* calling for particularized probable cause that the arrested person committed a crime, but it flatly rejects that standard in this case. The majority protests that "[a] requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot . . . ." *Id*. The issue, however, is not what is practical but what the Fourth Amendment requires, and in this case the majority departs from the Supreme Court's consistent instruction that individualized probable cause must precede arrest.

The majority takes the term "unit" from our decisions in *Cullinane* and *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006), but neither of those cases suggests that the Fourth Amendment permits an arrest of a person based on anything less than particularized probable cause. Calling the group or crowd a "unit" does not alter the probable cause calculus. Police don't arrest units. They arrest persons, and the Fourth Amendment requires they do so only upon an individualized determination that the person arrested acted unlawfully. The majority's approach ultimately fails because whatever else it may mean to have a reasonable belief that a crowd acted "as a unit," it cannot be the basis for the arrest of a member of that crowd, unless there is also a particularized showing that the person broke the law.

That the Fourth Amendment bars police from arresting a person solely because he or she is part of a group that includes others who have committed crimes should be undisputed. But the majority permits just that outcome. No case relied upon by the majority stands for the proposition for which this case will be cited: that police may lawfully execute mass arrests based upon assessments of group behavior and not upon particularized determinations about individual conduct. Because the Fourth Amendment demands more from the police than the majority requires, I cannot join Part II of the court's opinion.

## II.

The issue before the district court on plaintiffs' motion for summary judgment was whether the police had probable cause to arrest every demonstrator on the basis of Officer Keller's observations. By granting summary judgment, the district court erred in two ways.

4

First, the court disregarded a genuinely disputed issue of material fact. "A genuine issue of fact derives from the 'evidence [being] such that a reasonable jury could return a verdict for the nonmoving party' . . . resolving all ambiguities and drawing all factual inferences in favor of the nonmoving party." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). Keller said he saw every member of the crowd commit the crime of rioting. His statements on this point were unequivocal:

- "Each time a window was broken, the group cheered and its members raised their arms."
- "It appeared that the entire group was engaging in the celebrations as they moved . . . ."
- "The mob then cheered and its members raised their arms in celebration."
- "Someone in the group hurled a rock or brick through the window of [the Metropolitan Police Department's Latino Liaison Unit] Office . . . which was once again followed by loud cheering and arm waving from what appeared to be everyone in the group. I could see and hear this clearly from inside Cruiser 18 . . . ."

Decl. of Patrick Keller ¶ 6 (Feb. 26, 2008). Not surprisingly, plaintiffs denied they engaged in rioting, thus disputing that Keller observed every member of the crowd. *See, e.g.*, Plaintiffs' Motion for Partial Summary Judgment on Liability at 5–6, *Carr v. District of Columbia*, 565 F. Supp. 2d 94 (D.D.C. 2008) (No. 06-00098) ("[T]he police had no evidence identifying particular individuals who had engaged in the criminal acts."). The legal issue—whether there was particularized probable cause to arrest plaintiffs—turns on whether Keller did see every individual in the crowd commit a crime.

The assertion that one officer could see each of the 300 individual marchers is audacious. Regardless, in considering plaintiffs' motion for summary judgment, it was error for the district court not to view Keller's statements in the light most favorable to the District. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255. Keller says he saw each person in the march celebrate acts of violence. Because it is possible that a reasonable jury could credit his testimony, the district court erred by failing to take Officer Keller at his word.

Second, the district court incorrectly held that Keller's testimony was insufficient as a matter of law because it failed to establish the particularity called for in *Ybarra*. The court concluded, "These kinds of generalized statements are legally insufficient to establish probable cause. . . . Nowhere does the District make any effort to ascribe misdeeds to the specific individuals arrested." *Carr v. District of Columbia*, 565 F. Supp. 2d 94, 100 (D.D.C. 2008) (internal quotation marks and citation omitted). To the contrary, Keller's statements accomplish precisely what the district court concluded they did not. Keller ascribed misdeeds to the specific individuals arrested. He said he saw every member of the crowd commit a crime. In light of Keller's clear testimony about the criminal misconduct of each person in the crowd, the district court should not have granted summary judgment.

Ruling on this narrow ground corrects the district court's error without suggesting police may conduct mass arrests without individualized probable cause.