# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3552

_____

Brook Bernini; Matthew Byrnes; Simon  *
Cecil; Andrew Cohen; David Drew, Jr.;   *
Alana Michelle Exum; Bobby Reese     *
Hagy, Jr.; Adryn Hayes; Kevin Hundt;  *
Rachel Jackson; Tiana Johnson; Garth  *
Kahl; Jared Lanctot; Michael Larson;   *
Vain Mainstream; Craig Neef; Mary    *  Appeal from the United States
Ogle; Tim Phillips; Raphi Rechitsky;   *  District Court for the
Lambert Rochfort; Nick Segner; Ryan   *  District of Minnesota.
Solem; Zach Swift; Andrew            *
Temperante; Michael Ward, II; Rachel  *
Westlund; Nelson Whitmore; Kellan   *
Dubbels; Kristofer Dubbels; David    *
Morse; Bruce Wilkinson; Adam      *
Hayden, on behalf of themselves and all *
others similarly situated,         *
                              *
       Appellants,      *
                              *
    v.                *
                              *
City of St. Paul; Steven Frazer; Joe   *
Neuberger; Axel Henry; Patricia     *
Englund; Matthew Clark, in their    *
individual capacity,          *
                              *
       Appellees.      *

_____

Submitted:  June 15, 2011
Filed:  January 13, 2012

_____

Before COLLOTON, CLEVENGER,[1] and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

This civil action arose out of events that occurred on the first day of the 2008 Republican National Convention in St. Paul, Minnesota. Thirty-two people filed suit under 42 U.S.C. § 1983 against six police officers and the City of St. Paul, alleging violations of their rights under the First and Fourth Amendments. The parties stipulated to the dismissal of claims against one officer, and the district court[2] granted the defendants' motion for summary judgment on the remaining claims. The plaintiffs appeal the dismissal of their claims against five officers and the City, and we affirm.

I.

We recite the facts in the light most favorable to the plaintiffs, the nonmoving parties. From September 1-4, 2008, St. Paul hosted the Republican National Convention at the Xcel Energy Center. The Convention attracted large crowds of protestors. Throughout the first day, property damage was reported around the City. There were broken building windows, objects thrown at cars and buses, and vandalized police cars. After marches with permits had ended, Senior Commander Joseph Neuberger, who was the east area commander for mobile field force operations during the Convention, ordered that no one be allowed to enter the downtown area. Neuberger believed it was necessary to "reestablish control [and] reestablish law enforcement presence" downtown and around the Convention site.

_____

[1]The Honorable Raymond C. Clevenger, III, Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

The events at issue occurred on or near Shepard Road in St. Paul. Shepard Road runs along the southeastern edge of downtown St. Paul and borders the Mississippi River. The road was a major thoroughfare during the Convention. It served as a route for emergency vehicles to access the Xcel Energy Center, and it was the planned route of the First Lady's motorcade on the evening of September 1. Although Shepard Road runs along the edge of downtown St. Paul, it provides only limited access to downtown, because much of the road is bordered by the Mississippi River on one side and a large concrete wall on the other. Jackson Street and Sibley Street intersect with Shepard Road and provide access to the east end of downtown St. Paul.

After ordering downtown closed, Neuberger learned about a group of people marching east on Shepard Road. Neuberger instructed a team of officers—known as Neighborhood Response Team 36 ("Team 36")—to position itself at the intersections of Shepard Road and Jackson Street and Shepard Road and Sibley Street to prevent entry to the downtown. As Team 36 traveled to the intersections, the unit passed a large group marching along Shepard Road. The officers received information that the group was connected to unlawful acts that had occurred earlier in the day. Team 36 positioned approximately 11 officers at each intersection, blocking access to the downtown area.

At about 4:30 p.m., as seen on video recordings submitted as evidence, a group of approximately 100 people gathered at the intersection of Shepard Road and Jackson Street and stood on the sidewalk across the street from the officers on the south side of Shepard Road. About fifteen people, advancing behind two large signs, soon began to cross Shepard Road, moving toward the officers and downtown St. Paul. The words "Direct Action Against Capitalism" were written across one of the signs.

The officers instructed these people to "back up, back up!" As the group continued to cross Shepard Road, the officers deployed stinger blast balls. These balls contain rubber pellets; they are designed to sting the targeted persons. The small group then retreated to the sidewalk on the south side of Shepard Road. Although the plaintiffs deny seeing anyone throw objects at Team 36, the officers reported that numerous objects—including rocks and bags containing feces—were propelled at them.

After the group retreated to the sidewalk along Shepard Road, it began to move to the west. The officers, soon joined by reinforcements, also moved west in an attempt to direct the crowd away from Jackson Street and back in the direction from which it came. As the crowd proceeded west, it grew to include hundreds of people. On video footage, members of the crowd can be heard chanting in unison "the whole world is watching" and various profanities. The police continued to use non-lethal munitions, including smoke, blast balls, and chemical irritants, in an apparent effort to keep the crowd moving west.

In consultation with Neuberger, Steven Frazer, the officer in charge at the scene, decided to encircle the crowd in a park adjacent to Shepard Road and near Ontario Street, approximately 0.6 mile west of the Jackson Street intersection. Because much of Shepard Road is bordered by the river and concrete wall, this park presented the first opportunity west of Jackson Street to gather the crowd, which now included approximately 400 individuals. After the officers contained the crowd in the park, they announced multiple times by loudspeaker that all persons were under arrest and must sit down and place their hands on their heads. Officers then attempted to determine who had been present at the Shepard-Jackson intersection. According to one officer, these people "stayed together as group" and "were segmented off from the other people" in the park. The sorting process led to the release of approximately 200 people. The officers then booked and placed into custody about 160 others. The

parties dispute whether the officers ordered the crowd to disperse before encircling the park and making the arrests.

Thirty-two people filed suit pursuant to 42 U.S.C. § 1983 against the City of St. Paul and the five appellee police officers in their individual capacities. The plaintiffs were present along Shepard Road in various capacities, including as legal observers, medics, concert-goers, protestors, and members of the media. At least eighteen plaintiffs were present in the immediate vicinity of the Shepard-Jackson intersection at the time of the confrontation. The remaining plaintiffs claim they were located somewhere between the intersection and the park, and were added to the group as police moved the crowd west. Although each plaintiff was present in the park when it was encircled by the police, seven plaintiffs (including two who were present at the Shepard-Jackson intersection) were briefly detained and released, and twenty-five were booked and taken into custody. Those taken into custody were released within 72 hours, and all charges were eventually dismissed.

The plaintiffs allege that the actions of the police on Shepard Road and in the park violated their rights under the First and Fourth Amendments, as incorporated against the States through the Fourteenth Amendment. The district court granted summary judgment in favor of the officers and the City. This appeal followed.

II.

We first consider the plaintiffs' claims against the officers. Qualified immunity shields a public official from suit for civil damages when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The officers are therefore entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiffs, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation,

such that a reasonable officer would have known that his actions were unlawful. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We have discretion, in light of the circumstances, to resolve the appeal under either step of this analysis. *Harlow*, 457 U.S. at 818. We review the district court's grant of summary judgment *de novo*, considering the evidence in the light most favorable to the plaintiffs. *Doe v. Flaherty*, 623 F.3d 577, 583 (8th Cir. 2010).

A.

The plaintiffs first allege that the officers violated their Fourth Amendment right to be free from an unreasonable seizure by making unlawful arrests in the park. A warrantless arrest is reasonable under the Fourth Amendment where it is supported by probable cause. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime. *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). In a claim for damages, officers are "entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable"—that is, officers are not liable if they had "arguable probable cause" to make the arrest. *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008).

The plaintiffs base their claim on the general proposition articulated by the Supreme Court in *Ybarra v. Illinois*, 444 U.S. 85 (1979): "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." *Id.* at 91. The Court in *Ybarra* held that probable cause to search a bartender and the premises of a tavern in an Illinois town for evidence of drug sales did not justify the search of nine to thirteen customers who

happened to be present at the time of the search. According to the plaintiffs, the officers here violated the Fourth Amendment by conducting a mass arrest when they had probable cause with respect to only a subset of the arrestees.

The touchstone of the Fourth Amendment is reasonableness under the particular circumstances presented. *Samson v. California*, 547 U.S. 843, 855 n.4 (2006); *Terry v. Ohio*, 392 U.S. 1, 19 (1968). What is reasonable in the context of a potential large-scale urban riot may be different from what is reasonable in the relative calm of a tavern with a dozen patrons. The D.C. Circuit has addressed the practical dilemma faced by officers responsible for reacting to large group activity, and recognized that a "requirement that the officers verify that each and every member of a crowd engaged in a specific riotous act would be practically impossible in any situation involving a large riot." *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009). The court concluded that the Fourth Amendment "is satisfied if the officers have grounds to believe all arrested persons were a part of the *unit* observed violating the law." *Id.* at 407 (emphasis added). *Carr* thus demonstrates that a reasonable officer in St. Paul could have believed that the Fourth Amendment did not require a probable cause determination with respect to each individual in a large and potentially riotous group before making arrests.

Based on undisputed evidence, the officers in this case reasonably could have concluded that the group at the Shepard-Jackson intersection had committed a crime and that the group was acting as a unit. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) (holding that a court of appeals should view the facts on summary judgment in the light depicted by a videotape that captured the events in question). Video footage shows that the group marched east on Shepard Road and then stopped at the intersection, positioning itself directly across from the line of Team 36 officers. Many members of the group had donned gas masks and other facial coverings, as though they were preparing for a confrontation with police. Flags waived from within the crowd, and several people can be heard shouting profanities and taunting

-7-

the officers. A portion of the group, shielding itself behind two large signs, then began to cross the intersection toward the officers. And after the confrontation at the intersection, as the group was driven west on Shepard Road, members chanted statements in unison.

From these actions, a reasonable officer could have concluded that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul. It was reasonable, therefore, for an officer to believe that the group, as a whole, was committing one or more offenses under state law, including third degree riot and unlawful assembly. *See* Minn. Stat. §§ 609.71 subdiv. 3,[3] 609.705;[4] *State v. Hipp*, 213 N.W.2d 610, 614-15 (Minn. 1973). We thus conclude that the police did not violate the clearly established rights of sixteen plaintiffs who were both present at the intersection and arrested at the park. *Carr*, 587 F.3d at 409-10; *cf. Vodak v. City of Chicago*, 639 F.3d 738, 745-46 (7th Cir. 2011) (holding that police who effected a mass arrest of protestors were not entitled to qualified immunity where the crowd did not try to "break through the police barrier," and the circumstances "were not threatening to the safety of the police or other people").

As the officers directed the group west on Shepard Road toward the park, some new people became intermingled with the people composing the unit at the Shepard-

---

[3]"When three or more persons assembled disturb the public peace by an intentional act or threat of unlawful force or violence to person or property, each participant therein is guilty of riot third degree . . . ." Minn. Stat. § 609.71 subdiv. 3.

[4]"When three or more persons assemble, each participant is guilty of unlawful assembly, which is a misdemeanor, if the assembly is: (1) with intent to commit any unlawful act by force; or (2) with intent to carry out any purpose in such manner as will disturb or threaten the public peace; or (3) without unlawful purpose, but the participants so conduct themselves in a disorderly manner as to disturb or threaten the public peace." Minn. Stat. § 609.705.

Jackson intersection, and some of these additional persons were ultimately detained or arrested at the park. Under the circumstances of this case, however, we conclude that the officers are entitled to qualified immunity for making these seizures.

If the officers were to apprehend the offending protestors, they had no practical alternative but to move the offenders west on Shepard Road to the park to make an arrest. When confronted by the group at the intersection, the police were faced with a precarious situation. The group had demonstrated an intent to charge the downtown area, and members of the group were beginning to obstruct a major roadway that was designated for emergency vehicles and the First Lady's motorcade. The video footage shows that it would have been impractical for Team 36 to detain immediately the dozens of individuals present at the intersection. The officers were clearly outnumbered, and that portion of Shepard Road is bordered by the Mississippi River on one side and a concrete wall on the other. The officers thus reasonably attempted to move the group to the west.

The walk from Jackson Street to the park caused the group to expand and enveloped people who were not present at the intersection. But unlike the officer in *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006), who directed an indiscriminate mass arrest of about 400 persons in a park based on the unlawful acts of a small group of protestors, the police in this case attempted to discern who had been part of the unit at the intersection and released approximately 200 people, including seven of the plaintiffs, at the park.

The police did not violate the clearly established rights of the seven plaintiffs who were among those released at the park. These people were detained only while the officers sought to determine who were the members of the group at the intersection. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (explaining that although conduct "was ambiguous and susceptible of an innocent explanation," officers were permitted to "detain the individuals to resolve the ambiguity"). They

were thus held pursuant to an investigative detention that was "reasonably necessary to achieve the purpose of the temporary seizure." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (internal quotation omitted).

The nine remaining plaintiffs allege that they were arrested and taken into custody even though they were not present at the Shepard-Jackson intersection. They further contend that the group at the intersection numbered no more than thirty to forty people, and that the officers did not have probable cause (or even arguable probable cause) to arrest more than this number. The video footage, however, shows that the group was much larger. Approximately fifty people clustered closely together directly across from the officers. Another fifty or so people can be seen standing on either side of the group, along the sidewalk.

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (internal quotation omitted). In the circumstances of this case, we conclude that the arrest of 160 people in the park (including the nine plaintiffs) was within the range of objectively reasonable police conduct in light of the law that was clearly established and the information available to the officers.

It was reasonable for the officers to believe they could arrest those who were acting as a unit with the protestors who attempted to break through the police barrier at the Shepard-Jackson intersection. The videos depict approximately 100 people present at the intersection. The eleven officers were positioned under an overpass, making it difficult for them to see how far the crowd extended to the west. From the officers' vantage point, it appeared as if "people were continuously arriving from the west." The officers, especially without the benefit of the videos, could not have been sure of the precise number. They did release approximately 200 people at the park in an attempt to avoid custodial arrests of innocent bystanders. Given the situation at the intersection, the officers' allegedly mistaken belief at the park that 160 people

were part of a unit that had gathered to enter downtown at the Shepard-Jackson intersection was objectively reasonable. We therefore affirm the district court's conclusion that the officers are entitled to qualified immunity for the seizures.

B.

The plaintiffs also allege that the officers violated the Fourth Amendment's prohibition on unreasonable seizures by using excessive force. In evaluating this claim, we consider whether the officers' actions were objectively reasonable and balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). Whether a particular use of force is unreasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The record does not show that any of the defendants directly used force against any of the plaintiffs. The plaintiffs focus on the actions of Sergeant Axel Henry, the lead sergeant in Team 36. Henry testified in his deposition that when he deployed various non-lethal munitions at the Shepard-Jackson intersection, his deployment implicitly authorized officers under his command to do the same. The plaintiffs' theory apparently is that Henry's authorization amounted to direct participation by Henry in the deployment of non-lethal munitions by subordinates. *See Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997). As such, they contend that unreasonable use of non-lethal munitions by Henry or his compliant subordinates gives rise to Henry's liability under § 1983.

We conclude, however, that Henry is entitled to qualified immunity. In our view, the use of force was reasonable under the Fourth Amendment. At a minimum, it was not objectively unreasonable for Henry to authorize the force deployed in light

-11-

of clearly established law. The circumstances led officers reasonably to believe that a growing crowd intended to penetrate a police line and access downtown St. Paul. Henry's use and authorization to use non-lethal munitions to direct the crowd away from the intersection and toward a park where the crowd could be controlled did not violate clearly established rights.

The plaintiffs contend that it was unreasonable for the officers to continue to use force as the crowd moved west on Shepard Road, because the crowd was "complying with the movement of the officers and posed no threat to the officers." The video footage reveals, however, that some people would not leave the roadway and that some turned east and faced the officers. It was reasonable for the officers to deploy non-lethal munitions to keep all members of the crowd moving west.

Some plaintiffs assert that they were directly targeted by officers—one, for example, testified that an officer sprayed a chemical irritant on his face, neck, ears, and back. But there is no evidence that Henry authorized this type of force against a compliant individual. His implicit authorization occurred at the intersection and involved force deployed against a noncompliant crowd. The plaintiffs have not identified any defendant who used gratuitous force. The evidence, therefore, does not support the conclusion that Henry or any other defendant violated clearly established rights under the Fourth Amendment. The district court properly granted summary judgment on this claim.

C.

The plaintiffs' final claim against the individual officers is that the officers arrested them in retaliation for exercising their First Amendment rights. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prevail on a First Amendment retaliation

claim, the plaintiffs must show that they engaged in protected activity, that the defendants' actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and that a causal connection exists between the retaliatory animus and the injury. *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (per curiam); *see also Hartman*, 547 U.S. at 259. To establish this connection, the plaintiffs must show that they "were 'singled out' because of their exercise of constitutional rights." *Baribeau*, 596 F.3d at 481 (quoting *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007)).

The plaintiffs have not made a submissible First Amendment retaliation claim. Although the protestors at the Shepard-Jackson intersection were engaged in protected speech, members of the unit moved toward the police in a threatening manner and began to block traffic along a major roadway. A reasonable officer could conclude that this conduct violated Minnesota law and was not protected speech. *See Cross v. Mokwa*, 547 F.3d 890, 896 (8th Cir. 2008); *see also* Minn. Stat. §§ 609.71 subdiv. 3, 609.705. The video footage shows that officers engaged and pursued the group only after the unlawful conduct. And there is no evidence that the group was singled out while others similarly situated were not arrested. *See Osborne v. Grussing*, 477 F.3d 1002, 1006-07 (8th Cir. 2007). The only reasonable inference supported by the record is that the group's unlawful conduct, not the protected speech, motivated the officers' actions. *See Baribeau*, 596 F.3d at 481; *Kilpatrick*, 499 F.3d at 768-69. The district court was thus correct to grant summary judgment for the officers on this claim as well.

III.

Finally, we consider the plaintiffs' claim against the City. The plaintiffs allege that City policy authorized the alleged constitutional violations that occurred. They contend that Neuberger, who commanded approximately 500 officers as the east area commander, "had final authority over law enforcement decisions made on the streets

of downtown St. Paul on September 1," and that the City is therefore liable for his command decisions. We review the district court's summary judgment ruling in favor of the City *de novo*, viewing the evidence in the light most favorable to the plaintiffs. *Copeland v. Locke*, 613 F.3d 875, 879 (8th Cir. 2010).

A municipality can be liable under § 1983 if an "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Although a single unconstitutional act may not always suffice to support a claim of municipal liability, *see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (plurality opinion), "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). In such a circumstance, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion)); *see also Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405-06 (1997).

Neuberger's actions are not sufficient to impose liability on the City. "[W]hether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483 (plurality opinion). The plaintiffs, however, have not identified any provision of Minnesota or municipal law establishing that Neuberger had final policymaking authority. The St. Paul Code of Ordinances includes layers of policymaking authority above Neuberger's rank. The chief of police, for example, has "general authority and control over all departmental staff and shall oversee the proper fulfillment of all tasks and duties assigned to the department." St. Paul, Minn., Code of Ordinances pt. III, § 8.03; *see also id.* pt. I, § 1.04 (vesting the powers of the City in the mayor and council). The plaintiffs maintain that Neuberger did not have to obtain approval from any other official or governmental body before instructing his subordinates. But that Neuberger had "discretion in the exercise of particular

functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481-82 (plurality opinion); *see also Copeland*, 613 F.3d at 882-83. The district court correctly granted summary judgment in favor of the City.

*   *   *

The judgment of the district court is affirmed.

_____